**Opinion issued August 1, 2017**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00717-CR

———————————

**DEDRIC D'SHAWN JONES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 248th District Court**
**Harris County, Texas**
**Trial Court Case No. 1452040**

## O P I N I O N

A jury convicted appellant, Dedric D'Shawn Jones, of the third-degree felony

offense of assault on a family member, second offender.[1]  After appellant pleaded

---

[1]    *See* TEX. PENAL CODE ANN. § 22.01(b)(2) (West Supp. 2016).

true to the allegations in two enhancement paragraphs, the trial court assessed his punishment at twenty-five years' confinement. In two issues, appellant contends that (1) the trial court erroneously limited his cross-examination of a witness by refusing to allow him to cross-examine the witness about her interest in ongoing child-custody proceedings involving appellant's and the complainant's daughter, and (2) the trial court erroneously excluded evidence concerning the complainant's violent character.

We reverse and remand.

## Background

### A. *Factual Background*

On December 17, 2014, appellant was living in a house with his girlfriend, the complainant Amy Jimenez, their one-year-old daughter, and Jimenez's mother, Adeline Gonzales. All four of them started watching a movie in the living room of the house. Appellant made inappropriate comments about a scene in the movie, and Jimenez told him to stop because Gonzales was in the room. Gonzales testified that "there was a lot of frustration in the room." She left the room with the baby, and appellant went into the garage. Gonzales later returned to the living room and told Jimenez that the baby needed some items from the store for school. Appellant's and Gonzales's accounts of what happened after this point differ dramatically.

2

According to appellant, after he left the living room, he stayed in the garage for about an hour and a half playing a game on his cell phone. Jimenez "came in the garage a few times" and talked to him. Defense counsel asked whether there was a fight every time Jimenez came into the garage, and appellant replied that there was no fight, but "she was trying to pick a fight[.]"

Appellant was sitting between two cars playing on his phone, basically ignoring Jimenez. She then got "in [his] face" and "karate kick[ed the] phone out of [his] hand." When asked by his counsel whether Jimenez slapped the phone down or kicked it, appellant replied, "She did a pretty good karate kick." He stated that the phone "hit the car, fell on the floor. I'm in a tight little space. She kind of hit my hand pretty hard." Appellant then slapped Jimenez. When asked whether Gonzales saw the confrontation, appellant replied, "I doubt it" because of the tight area and because Jimenez's back was "towards the window of the kitchen by the door" to the garage.

According to Gonzales, however, Jimenez went out to the garage, and she and appellant started arguing. Jimenez wanted the keys to the car to go to the store, and appellant would not answer her. Gonzales testified that she had the baby in her arms, and she opened the garage door to give Jimenez some money. She saw appellant take "a swing at [Jimenez] and he hit her in the face." The prosecutor then asked her, "Now prior to you seeing that, did you see [Jimenez] make any contact, physical

3

contact with the defendant?" Gonzales replied, "She was trying to get his attention. He had a cell phone in his hand. She whacked the phone in his hand."

Gonzales did not know what happened to the phone, but, in response to the prosecutor's statement, "So you're saying you saw [Jimenez] make contact with his phone," she replied, "Right, trying to get his attention." In response to the prosecutor's question, "What did that sound like when he struck your daughter?" Gonzales testified, "I mean, it was pretty hard because her whole face went back. I looked back at her. I saw blood coming out of her face," out of "[h]er lip, right here, mouth." Gonzales then started screaming to appellant, "I told you not to put your hands on her anymore." She stated, "I had the baby in my arms and I told [Jimenez], I said, Get out, get in your car, go your dad's house." Jimenez looked "pretty scared. She had a look on her face I had never seen before and I'm a mother. I felt what I was looking at and I said, Get out of here, get in your car and go. And I'll call you when you can come back." Gonzales then called 9-1-1. She testified that she did not see Jimenez kick appellant "at any point," explaining, "I was standing in the middle of them by that time and there was a car there."

Appellant did not immediately leave after the altercation with Jimenez. He demanded to kiss and hug his daughter. He testified, "[Gonzales] is real possessive of my daughter. She wouldn't let me get my daughter. So I stayed around longer. [Gonzales was] yelling at me. And I'm yelling at her, just trying to see my daughter

real quick before I left." No other blows were thrown. Appellant testified that he went back into the house to get his wallet and identification, and when he discovered that Gonzales had called 9-1-1, he jumped the fence and went to the park. Appellant came back to the house after the police arrived, and he was arrested.

Jimenez had left the scene in response to Gonzales's order before any of this happened. Gonzales testified extensively, however, as to appellant's behavior after Jimenez left. According to her testimony, appellant ransacked the interior of the house and came back into the garage, "[s]creaming obscenities, calling me everything in the book and ransacking what he could. I had [the baby] in my arms. I was more afraid of that than anything else." She stated, "I was afraid to go back in the house." Appellant came back into the garage, and the baby was "crying, crying," and Gonzales was trying to calm her down. Appellant picked up a jack that was in the garage and started swinging it just a couple of feet from Gonzales while screaming obscenities at her, including "Get your own F'ing baby. This is my F'ing baby. You rotten F'ing B. It was going on and on." She stated that appellant also kicked the doors to her car. She kept screaming, "Get out of here, get out of here, get of here," and appellant said in response, "I'm going to get out of here when I kiss my baby."

According to Gonzales, appellant grabbed the baby, saying "I just want to hug my baby," while Gonzales still held the baby in her arms. Gonzales "kept telling

5

[appellant] to leave [the baby] alone because she started crying. And he grabbed her little leg and he started doing this to her little body. And it scared me, because I said, My God, he could have ripped her spinal cord. I let her go." Appellant stepped away "because he was leaving with [the baby]," holding her "like a rag doll under his arm. And she was crying and crying. He's screaming." Gonzales testified that the baby

> was pushing and pushing and she was screaming this loud cry like I never heard it before. [Appellant] finally puts her down because she's wiggling to get away from him. He puts her down and he kind of nudges her and I ran toward her and I grabbed her. I had her in my arms. I wouldn't let her go. He was still screaming at me, I'm going to get her. I'm going to get her. At that point I was going to do whatever I needed to do because I wasn't going to let her go.

When the police arrived, appellant went back inside the house and escaped out the back door over the fence.

Gonzales testified that Jimenez drove up a few minutes later, and "[s]he was mad, telling me, Mom, why did you call the police? Why did you call the police. . . . She's upset and she's screaming. I'm trying to regroup to what's just happening. The baby's still crying and it's a whole lot of commotion going on at the same time." Jimenez "had a big ball in her lip. . . . You could see a little dried blood on her face. She had a big ball on her lip here." Both Gonzales and Jimenez were interviewed by the police.

When asked whether he told his side of the story to the police, appellant testified, "I didn't feel like my story means anything. Two angry women." He also testified that Jimenez did not file charges against him, she failed to receive a letter of non-prosecution to sign that he had sent to her, and she came to visit him every day he was in jail prior to trial. Appellant testified that Jimenez and Gonzales had a volatile relationship, but the court sustained as irrelevant the State's objection to the question of whether appellant had ever seen Jimenez strike her mother. Appellant finally testified that the other cases he had had involving family violence also had to do with knocking a phone out of someone's hand; he was charged and pled guilty in order "[t]o come home and take care of my child."

Houston Police Department Officer J. Portillo responded to Gonzales's 9-1-1 call. As he approached the house, he saw Gonzales and Jimenez walk into the garage. Both of them "seemed pretty upset and emotional." Officer Portillo observed redness on Jimenez's face and a cut on her upper lip. Although Jimenez ultimately spoke with Officer Portillo, she initially did not want to speak to police. Officer Portillo did not see any damage to property in the garage, and the inside of the house did not appear to have been ransacked, as Gonzales had testified.

7

## B.    *Procedural Background*

After voir dire but before the jury was sworn in, defense counsel sought permission to introduce evidence of an ongoing Child Protective Services ("CPS") proceeding to terminate the parental rights of both appellant and Jimenez to their daughter.  Counsel argued:

| [Defense Counsel]: | The third and last point, Judge, it is my understanding that CPS is involved and the welfare of the [child] in whether or not parental rights were taken from the complaining witness, [Jimenez], and the defendant, and that one of the persons who may be—I don't know how to put this gently—would get the grandchild would be the mother. Again, it would go to motive as to why—if she sat up there and saw, based on the police report, if she saw mutual conduct— |
|---|---|
| The Court: | So you want to ask Adeline Gonzales whether there's a CPS investigation and whether she gets the children if that CPS issue was sustained? |
| [Defense Counsel]: | Yes. |

The trial court ruled that this evidence was not relevant.  Defense counsel also sought permission to question Gonzales about Jimenez's reputation in the community for violence and, specifically, whether Jimenez had ever been violent towards Gonzales.  The trial court ruled that this evidence was not relevant and was inadmissible under Rule of Evidence 608.

Later in the trial, after Gonzales had testified before the jury, defense counsel made an offer of proof concerning testimony from Gonzales that the trial court had excluded. Gonzales testified that Jimenez had threatened her on a few occasions in the past. She also testified that Jimenez had hit her on several occasions and that Jimenez had been the initial aggressor. With respect to the termination proceedings, defense counsel and Gonzales had the following exchange:

Q. Do you know that there's a CPS—that there's a child custody battle going on to eliminate parental rights of both Amy and Dedric?

A. Yes, sir.

Q. Do you have an interest in that being done?

A. I don't understand what that means.

Q. Do you have a preference?

A. Do I have a preference of what?

Q. That their parental rights be terminated or not?

A. I don't have any say in that. That damage has been done between the both of them.

Q. My understanding is the child is with an aunt; is that correct?

A. My sister.

Q. Your sister?

A. Yes. And before that, she was with me. I had her. I've always had her.

Q. The reason that you take care of the child is because of the relationship that Dedric and Amy have, correct?

A. I'm sorry?

9

Q. It's because of the type of relationship that Amy and Dedric have and the things that they do destructive towards each other, correct?

A. I'm not sure I want to answer that.

Q. The reason—

A. Yes, that's why I take care of her because I want her to be safe. She's a beautiful little girl. She deserves to be safe. (Witness crying.)

Q. In this particular case, it is your testimony that Amy hit Dedric first, correct?

A. She slapped the phone in his hands.

The jury ultimately found appellant guilty of the offense of assault on a family member. After appellant pleaded true to the allegations in two enhancement paragraphs, the trial court assessed his punishment at twenty-five years' confinement. This appeal followed.

## Preservation of Error

We first consider whether appellant preserved his complaint about his cross-examination of Gonzales for appellate review.

The dissenting opinion argues that appellant failed to preserve his complaint for appellate review because his offer of proof about Gonzales's testimony regarding CPS termination proceedings was insufficient to establish Gonzales's alleged bias against appellant. A party may complain on appeal about a ruling excluding evidence if the error "affects a substantial right of the party" and the party "informs the court of [the evidence's] substance by an offer of proof, unless the substance was

10

apparent from the context." TEX. R. EVID. 103(a). An offer of proof may consist of a concise statement by counsel that includes a reasonably specific summary of the evidence and the relevance of the evidence, or the offer may be in question-and-answer form. *Mays v. State*, 285 S.W.3d 884, 889–90 (Tex. Crim. App. 2009). "The primary purpose of an offer of proof is to enable an appellate court to determine whether the exclusion was erroneous and harmful. A secondary purpose is to permit the trial judge to reconsider his ruling in light of the actual evidence." *Id.* at 890.

Here, before the jury was sworn in, defense counsel stated that he wished to question Gonzales about several matters, including an ongoing CPS proceeding to terminate the parental rights of appellant and Jimenez, noting that Gonzales could get custody of the child and this would be relevant to her motive to testify. The trial court ruled that this evidence was not relevant. Later, after questioning Gonzales, defense counsel put on an offer of proof concerning several topics, including Gonzales's knowledge of, and interest in, the ongoing termination proceedings. Gonzales testified that she was aware of the termination proceedings, but she did not "have any say" in whether the court terminated appellant's and Jimenez's parental rights. Gonzales then testified that the child was currently staying with her sister, although before that the child had always lived with Gonzales, and that she would take care of the child because she wanted the child to be safe. We conclude that this offer of proof sufficiently informed the trial court of the substance of the evidence

11

that appellant sought to introduce, and appellant therefore preserved his complaint about the exclusion of this evidence. *See* TEX. R. EVID. 103(a); *Mays*, 285 S.W.3d at 889–90.

The dissenting opinion complains about procedural defects concerning appellant's offer of proof. Specifically, the dissenting opinion argues that appellant's offer of proof failed to segregate admissible evidence from inadmissible evidence, such as Gonzales's testimony regarding Jimenez's past violent conduct, and that appellant failed to obtain a ruling on the admissibility of the evidence relating to the termination proceeding.

The dissent cites this Court's opinion in *Sohail v. State* for the proposition that when a party proffers evidence containing both admissible and inadmissible evidence but does not segregate the evidence to offer only the admissible statements, the trial court may properly exclude all the statements. *See* 264 S.W.3d 251, 261 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). While this is a correct statement of the law, *Sohail* does not involve an offer of proof. Rather, in *Sohail*, the defendant sought to introduce into evidence during his case-in-chief a letter, an affidavit to dismiss a protective order, and a tape recording of the complainant's conversation with an unidentified individual, all of which included both admissible and inadmissible evidence. *Id.* The defendant did not attempt to redact the inadmissible statements from these exhibits. *Id.* at 260. As a result, this Court held that the trial

12

court properly excluded the exhibits because they contained inadmissible evidence. *Id.* at 261.

The instant case involves an offer of proof, which, necessarily, is made after the trial court has already ruled that evidence is inadmissible and has excluded that evidence. *See* TEX. R. EVID. 103(a)(2); *Mays*, 285 S.W.3d at 889 (stating that to preserve error regarding trial court's decision to exclude evidence, complaining party must make offer of proof setting forth substance of proffered evidence). The reason appellant made his offer of proof, which contained testimony from Gonzales on several subjects, including the termination proceedings and Jimenez's past violent conduct, was that the trial court had already excluded all of this evidence.

The dissent also argues that appellant failed to obtain a ruling on the admissibility of the offered testimony concerning the termination proceedings. This is incorrect. After voir dire, but before the jurors had been sworn in, the trial court, defense counsel, and the State discussed on the record "issues of admissibility of certain pieces of evidence." Defense counsel stated that he wished to question Gonzales about the termination proceedings. The trial court stated, "I'm going to find the CPS investigation and any potential outcomes are not relevant to this trial and in fact would be more [prejudicial] to the defendant." The trial court did not defer ruling on admissibility—it immediately ruled right then that evidence concerning the termination proceedings was not relevant and was, thus,

13

inadmissible. Later, after Gonzales testified in front of the jury, appellant put on his offer of proof. Appellant obtained a ruling on the admissibility of the evidence of the termination proceedings. He was not required to obtain a second ruling on the evidence after he made his offer of proof, which he made because the trial court excluded the evidence of the termination proceedings.[2] *See* TEX. R. EVID. 103(a).

We conclude that appellant preserved his complaint regarding Gonzales's bias for appellate review, and we turn to his appeal.

## Denial of Cross-Examination

In his first issue, appellant contends that the trial court violated the Confrontation Clause by erroneously limiting his cross-examination of Gonzales concerning any interest she might have in ongoing child-custody proceedings involving appellant's and Jimenez's daughter. He contends that the inability to question Gonzales about her motivation in testifying against him—specifically her interest in possibly gaining custody of his child—together with his inability to question Gonzales regarding Jimenez's past history of violence, severely undermined his ability to present his defense that he slapped Jimenez in self-defense.

---

[2] As support for the argument that appellant failed to obtain a ruling, the dissent cites *Geuder v. State*, 115 S.W.3d 11, 14–15 (Tex. Crim. App. 2003), which held that a pretrial motion in limine generally does not preserve error concerning the exclusion of evidence. *Geuder* did not address offers of proof or whether the complaining party, after obtaining a ruling excluding evidence, must obtain an additional ruling after making an offer of proof—a ruling which would have no function.

14

Thus, appellant makes two critical arguments in this issue. First, he was denied the constitutional right of confrontation. Second, the ability to confront Gonzales as to her interest in the custody proceedings was essential to his ability to prove his defense of self-defense as she was the only witness besides himself who testified as to the facts of the confrontation between himself and Jimenez, upon which he was convicted and sentenced to twenty-five years' confinement. We agree with appellant.

## A.      *Cross-Examination: The Constitutional Right of Confrontation*

Cross-examination serves three general purposes: to identify the witness with the community so that independent testimony regarding the witness's reputation for veracity may be sought, to allow the jury to assess the credibility of the witness, and to allow facts to be brought out tending to discredit the witness by showing that his testimony was untrue or biased. *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996). Cross-examination is, by its nature, exploratory, "and there is no general requirement that the defendant indicate the purpose of his inquiry." *Id.* Rather, the defendant "should be granted a wide latitude even though he is unable to state what facts he expects to prove through his cross-examination." *Id.*

The classic case on the right of confrontation under circumstances similar to those in this case is *Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105 (1974). In that case, the United States Supreme Court held that the Confrontation Clause means

15

more than the right of an accused in a criminal prosecution to be allowed to confront the witnesses against him "physically." *Id.* at 315, 94 S. Ct. at 1110. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination," as this is "the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 315–16, 94 S. Ct. at 1110; *see Johnson v. State*, 433 S.W.3d 546, 551 (Tex. Crim. App. 2014) (quoting *Davis*, 415 U.S. at 315–16, 94 S. Ct. at 1110). The defendant is not only permitted to delve into the witness's story to test his perceptions and memory but is traditionally allowed to impeach or discredit the witness. *Davis*, 415 U.S. at 316, 94 S. Ct. at 1110. A defendant's

> attack on the witness's credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial and is "always relevant to discrediting the witness and affecting the weight of his testimony."

*Id.* (quoting 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970)).

"[E]xposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S. Ct. 1431, 1435 (1986); *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998) ("Exposing a witness' motivation to testify for or against the accused or the State is a proper and important purpose of cross-examination."). "The possible animus, motive, or ill will of a

16

prosecution witness who testified against the defendant is never a collateral or irrelevant inquiry, and the defendant is entitled, subject to reasonable restrictions, to show any relevant fact that might tend to establish ill feeling, bias, motive, interest, or animus on the part of any witness testifying against him." *Billodeau v. State*, 277 S.W.3d 34, 42–43 (Tex. Crim. App. 2009); *see Johnson v. State*, 490 S.W.3d 895, 909–10 (Tex. Crim. App. 2016).

Particularly pertinent to this case is the Supreme Court's holding in *Davis* that the defendant in that case had the right to attempt to show that a prosecution witness who was on probation was biased against the defendant because of the witness's "vulnerable status." 415 U.S. at 317–18, 94 S. Ct. at 1111; *see also Carroll*, 916 S.W.2d at 500 ("Appellant's cross-examination was clearly an attempt to demonstrate that [the witness] held a possible motive, bias or interest in testifying for the State. . . . A defendant is permitted to elicit any fact from a witness intended to demonstrate that witness's vulnerable relationship with the state."). The *Davis* Court observed,

> We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that *the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony which provided "a crucial link in the proof . . . of petitioner's act."*

415 U.S. at 317, 94 S. Ct. at 1111 (quoting *Douglas v. Alabama*, 390 U.S. 415, 419, 85 S. Ct. 1074, 1077 (1965)) (emphasis added).

The scope of appropriate cross-examination is necessarily broad. *Carroll*, 916 S.W.2d at 497. It encompasses all facts and circumstances that, tested by human experience, tend to show that the witness may shade his testimony for the purpose of establishing one side of the cause only. *Id.* at 497–98 (quoting *Jackson v. State*, 482 S.W.2d 864, 868 (Tex. Crim. App. 1972)). Accordingly, a defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias, or interest for the witness's testimony. *Lewis v. State,* 815 S.W.2d 560, 565 (Tex. Crim. App. 1991).

A defendant's constitutional right to confrontation is violated when appropriate cross-examination is limited. *See Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435; *Carroll*, 916 S.W.2d at 497. The trial court has no discretion to so drastically curtail the defendant's cross-examination as to leave him unable to show why the witness might have been biased or otherwise lacked the level of impartiality expected of a witness. *Johnson*, 433 S.W.3d at 555. However, the proponent of the evidence "must establish some causal connection or logical relationship between the [source of bias] and the witness' 'vulnerable relationship' or potential bias or prejudice for the State, or testimony at trial." *Carpenter*, 979 S.W.2d at 634

18

(analyzing admissibility of evidence of pending charges against witness); *see Irby v. State*, 327 S.W.3d 138, 147–48 (Tex. Crim. App. 2010) (same).

## B. *Law Concerning Defense of Self-Defense*

Appellant argues that he hit Jimenez in self-defense after she karate-kicked his phone out of his hands. Self-defense is statutorily defined and provides a defense to prosecution when the conduct in question is "justified." TEX. PENAL CODE ANN. §§ 9.02, 9.31 (West 2011). Under Texas Penal Code Chapter 9, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). "The use of force against another is not justified," either "in response to verbal provocation alone" or "if the actor provoked the other's use or attempted use of unlawful force." *Id.* § 9.31(b)(1), (4).

When a defense of self-defense is raised, as here, the reviewing court's task is to "determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the crime] beyond a reasonable doubt *and also* would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (emphasis added).

In a claim of self-defense, "a defendant bears the burden of production," while "the State then bears the burden of persuasion to disprove the raised defense."

19

*Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton*, 804 S.W.2d at 913–14). The defendant's burden of production requires the defendant to adduce some evidence that would support a rational jury finding as to the defense. *See* TEX. PENAL CODE ANN. § 2.03(c) (West 2011) ("The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense."); *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013); *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). "[E]ven a minimum quantity of evidence is sufficient to raise a defense as long as the evidence would support a rational jury finding as to the defense." *Krajcovic*, 393 S.W.3d at 286 (citing *Shaw*, 243 S.W.3d at 657–58). "[A] defense is supported (or 'raised') if there is evidence in the record making a prima facie case for the defense." *Shaw*, 243 S.W.3d at 657. "A prima facie case is that 'minimum quantum of evidence necessary to support a rational inference that [an] allegation of fact is true.'" *Id.* (quoting *Tompkins v. State*, 774 S.W.2d 195, 201 (Tex. Crim. App. 1987)).

If the defendant meets his burden of production, the burden of persuasion shifts back to the State. *Zuliani*, 97 S.W.3d at 594. The State's "burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt." *Id.* (citing *Saxton*, 804 S.W.2d at 913). In order to prove the offense beyond a reasonable doubt, it must likewise disprove the defense of self-defense beyond a reasonable doubt. *Saxton*,

804 S.W.2d at 914. Thus, if appellant produced at least some evidence that would support a rational jury's finding that he hit Jimenez in defense to her use of force against him, the State would have to disprove his defense of self-defense beyond a reasonable doubt to prove the family violence charge against him beyond a reasonable doubt.

With appellant's defense in mind—that he slapped Jimenez in self-defense only after she karate-kicked him first—we turn to the effect of Gonzales's testimony against appellant. Appellant argues that his questioning could have shown that Gonzales was biased against him because of her interest as a potential managing conservator of his child and that, therefore, the trial court erred in not allowing him to question her as to ongoing parental rights termination proceedings against himself and Jimenez.

## C. *Relationship Between Family Violence Conviction and Child Custody Proceedings*

Termination and custody proceedings always entail the determination of custody based on the conduct of the parents and the best interests of the child. The commission of family violence is a mandatory consideration in determining the custody of a child in both custody and termination proceedings. Texas Family Code section 153.004(c) requires that, in custody proceedings, the family court shall consider the commission of family violence in determining whether to deny, restrict, or limit possession of a child by a parent. TEX. FAM. CODE ANN. § 153.004(c) (West

21

2014).  In a case to terminate parental rights brought by the Department of Family and Protective Services ("DFPS") under Family Code section 161.001, DFPS must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child.  *Id.* § 161.001(b) (West Supp. 2016); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship.  *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).  However, prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016).

A grandparent can have an interest in a child custody determination—whether in connection with termination proceedings or not—if the grandparent requests possession of a child by filing an original suit or a suit for modification.  *Id.* § 153.432(a) (West 2014); *see In re Chambless*, 257 S.W.3d 698, 699–700 (Tex. 2008) (per curiam).  However, Family Code section 153.131(a) creates a presumption in favor of a parent when a non-parent (such as DFPS or a grandparent or other relative) is seeking custody of a child.[3]  TEX. FAM. CODE ANN. § 153.131(a)

---

[3]      Section 153.131(a) provides:

22

(West 2014).  The parental presumption set out in Family Code section 153.131(a) is expressly made subject to section 153.004 of the Code. Section 153.004(b) provides "a rebuttable presumption that the appointment of a parent as the sole managing conservator of a child or as the conservator who has the exclusive right to determine the primary residence of a child is not in the best interest of the child if credible evidence is presented of a history or pattern of past or present . . . physical . . . abuse by that parent directed against the other parent . . . ." *Id.* § 153.004(b).  And, as stated above, section 153.004(c) requires that, in custody proceedings, the family court "*shall consider the commission of family violence* in determining whether to deny, restrict, or limit possession of a child by a parent . . . ." *Id*. § 153.004(c) (emphasis added).

## D.   *Confrontation Clause Analysis*

Appellant was charged with assault on a family member, Jimenez—an act of family violence.  The elements of assault on a family member, as relevant here, are (1) intentionally (2) causing bodily injury (3) to another person (4) who is a member

---

Subject to the prohibition in Section 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

TEX. FAM. CODE ANN. § 153.131(a) (West 2014).

of the defendant's family or a person with whom the defendant has a "dating relationship." TEX. PENAL CODE ANN. § 22.01(a) (West Supp. 2016) (defining assault). Under the Penal Code, the offense is enhanced from a Class A misdemeanor to a third-degree felony if the assault is against a family member or involves "dating violence" and the defendant has certain prior convictions, including a prior conviction for assault on a family member. *Id.* § 22.01(b)(2)(A); TEX. FAM. CODE ANN. § 71.0021 (West Supp. 2016) (defining "dating violence" and "dating relationship"); *id.* § 71.003 (West 2014) (defining "family"). The punishment for conviction of a third-degree felony—such as assault on a family member, second offender—when the defendant has two prior felony convictions is confinement for twenty-five years to life. *See* TEX. PENAL CODE ANN. § 12.42(d) (West Supp. 2016).

Because he had a prior conviction for assault on a family member as well as two prior felony convictions, appellant faced a sentence of twenty-five years to life upon conviction in this case for family violence. His defense at trial was that Jimenez "karate kick[ed]" his phone out of his hand when he would not respond to her and that he struck her in self-defense. The only witnesses to the offense with which appellant was charged who testified at trial were appellant and Gonzales. Jimenez, the complainant, did not testify.

At the time of trial, Jimenez and appellant were involved in ongoing child custody proceedings to determine whether their parental rights to their one-year-old

daughter should be terminated. Although there is a strong presumption that the best interest of the child is served by preserving the parent-child relationship, under the plain language of Family Code sections 153.131(a) and 153.004(b) and (c), the parental presumption is removed by a showing that the parent seeking to be appointed managing conservator has a history or pattern of past or present physical abuse directed against the other parent. *See* TEX. FAM. CODE ANN. §§ 153.004(b), 153.131(a). Therefore, appellant's conviction for family-violence assault, combined with his past family-violence assault conviction, is exactly the type of evidence required to justify both the termination of his parental rights and the appointment of Jimenez as sole managing conservator or, if Jimenez were likewise to have her rights terminated or to be shown to have a history of family violence, the parental presumption would be removed for both parents, and the appointment of a non-parent, like Gonzales, as sole managing conservator could be pursued. Thus, appellant had a "vulnerable status" with respect to testimony that he committed family violence. *See Davis*, 415 U.S. at 317–18, 94 S. Ct. at 1111; *Carroll*, 916 S.W.2d at 500.

In this criminal case, it was the jury's responsibility to determine beyond a reasonable doubt whether appellant committed an act of domestic violence against Jimenez—hitting her in the face—without justification or whether appellant raised a reasonable doubt as to whether his striking Jimenez was justified because Jimenez

used unjustified force first against him by striking or "karate kicking" the phone from his hand. Only by making that determination could the jury determine whether appellant had the requisite intent to use unlawful force against Jimenez beyond a reasonable doubt and should be convicted of domestic violence or whether appellant had raised a reasonable doubt as to his intent and should be acquitted. And on this outcome-determinative issue, the weight and credibility of Gonzales's testimony was critical.

The controlling question on appeal is whether, had appellant been able to cross-examine Gonzales on the termination proceedings and her interest in them, he could have made the jury aware of a bias or interest on her part that would have motivated her to testify against him on the underlying offense of domestic violence against Jimenez because of her interest in obtaining custody of his child or preventing appellant from maintaining custody of the child. Such a consideration directly impacts the weight to be given a witness's testimony by the jury. *See Davis*, 415 U.S. at 317, 94 S. Ct. at 1111. Thus, appellant's cross-examination of Gonzales's interest in the outcome of the parental rights termination proceeding *had the potential to raise a reasonable doubt* in the mind of the jury as to whether appellant assaulted Jimenez *without justification*, committing an act of domestic violence that could—and did—send him to prison for twenty-five years to life, or whether he acted with justification in response to Jimenez's initial, unjustified, and

unlawful act of force and therefore should have been acquitted on the basis of his defense. *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14.

We conclude that this is a classic Confrontation Clause case. Here, the converse of *Davis* is at issue: appellant, the defendant—as opposed to the witness against him, Gonzales—was in a particularly vulnerable status as a defendant in a domestic dispute in which a conviction carried a twenty-five-year to life sentence and was also mandatory evidence in determining his parental and custody rights. *See* TEX. FAM. CODE ANN. §§ 153.004, 153.131. Thus, he was extremely vulnerable to losing custody of his child should he be convicted of assaulting Jimenez without justification. The principal witness against him—indeed the only eyewitness who testified at trial besides himself—was Gonzales, the grandmother of the child. Her testimony on direct examination showed a deep possessory interest in the child, and she could not be excluded on the basis of anything in the record of this case as a possible managing conservator should appellant and Jimenez lose their parental rights, or should appellant lose his. Thus, cross-examination and impeachment of Gonzales directed toward revealing her "possible bias, prejudice or ulterior motives . . . as they [might] relate directly to issues or personalities in the case" was not only relevant but "'always relevant as discrediting the witness and affecting the weight of [the] testimony.'" *Davis*, 415 U.S. at 316, 94 S. Ct. at 1110; *Johnson*, 433 S.W.3d at 551.

27

Under *Davis*, "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony which provided 'a crucial link in the proof . . . of [the defendant's] act'" of domestic violence against Jimenez. 415 U.S. at 317, 94 S. Ct. at 1111. Appellant argued that he struck Jimenez in self-defense. The only other eyewitness to the incident was Gonzales. The State asked Gonzales whether Jimenez made any physical contact with appellant before he struck her. Gonzales testified, "She was trying to get his attention. He had a cell phone in his hand. She whacked the phone in his hand." Gonzales did not see what happened to the phone. She also testified that she did not see whether Jimenez kicked appellant, stating, "I was standing in the middle of them by that time and there was a car there." Appellant testified it was unlikely that Gonzales even saw clearly what happened between him and [Jimenez] because "like the tight area we [were] in, . . . [Jimenez's] back is towards the window of the kitchen by the door" and Gonzales came into the garage at approximately the moment the confrontation occurred.

Gonzales did not testify to anything else about the confrontation between Jimenez and appellant with which appellant was charged. Instead, she testified graphically and at length about her fears for her granddaughter's safety in appellant's presence and the danger she believed he presented to the child she was protecting from him. None of this testimony was relevant to the charged offense, but it was

28

highly prejudicial to appellant, both in his trial for striking and injuring Jimenez without justification and with respect to his ability to retain his parental rights to the child, both because appellant faced a minimum twenty-five year sentence for striking Jimenez without justification and because domestic violence is a mandatory consideration in the termination and custody proceedings that were then ongoing—proceedings in which the elimination of the parental presumption in favor of appellant would allow Gonzales to seek custody of the child.

It is hard to imagine a more clear-cut case in which a criminal defendant should have been permitted to confront the sole eyewitness against him to allow the jury to assess her credibility and to allow facts to be brought out regarding her interest in the child that might tend to discredit her by showing that her relevant testimony with respect to the charged offense was untrue or biased. *See Carroll*, 916 S.W.2d at 497; *see also Davis*, 415 U.S. at 316, 94 S. Ct. at 1110 (stating that partiality of witness is subject to exploration and is always relevant to discrediting witness and affecting weight of testimony, and stating that exposing witness's motivation in testifying is proper function of protected right of cross-examination).

As appellant points out, an interest in the outcome of a child custody determination has twice been held by the intermediate appellate courts of this state to be a valid area for exposing bias through cross-examination in circumstances that

29

did not involve termination proceedings or the potential of a long prison sentence for the party seeking cross-examination.

In *Fox v. State*, the Fourteenth Court of Appeals held that Rule of Evidence 608, prohibiting cross-examination on a witness's general character for truthfulness, did not preclude cross-examination of a mother as to whether she attempted to implant the suggestion of the father's sexual abuse of the children where, if the father were in jail or even accused of sexual abuse of a child, the mother would stand a far better chance of obtaining custody of all of the children in a separate divorce proceeding. 115 S.W.3d 550, 567–68 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). The court of appeals held that there was no legitimate reason for the trial court to limit the cross-examination because the subject of motivation and bias was not exhausted; the cross-examination was not designed to annoy, harass, or humiliate, but rather to show motive and bias; and the cross-examination did not endanger the witness. *Id.* at 567. Because the requested cross-examination was proper under the rules of evidence and required by the Confrontation Clause of the United States Constitution, the trial court abused its discretion in limiting the cross-examination. *Id.* at 568.

*Ryan v. State*, an unpublished decision, is also illustrative. *See* No. 04-08-00594-CR, 2009 WL 2045211 (Tex. App.—San Antonio July 15, 2009, no pet.) (not designated for publication). In that case, the court of appeals held that the trial court

30

abused its discretion by limiting cross-examination of Ryan's ex-wife about custody of their oldest child. *Id.* at \*3–4. The ex-wife testified that when she and Ryan had previously separated, the family court had awarded Ryan custody of the oldest child. *Id.* at \*4. Ryan testified that, after he was arrested for assaulting his ex-wife in the underlying offense, she took both children, moved out of the residence, and did not return the oldest child to him. *Id.* The court did not permit Ryan to question his ex-wife about any subsequent custody disputes between them or the effect of any such disputes on her testimony. *Id.*

The court of appeals observed that the commission of family violence is a mandatory factor to be considered in determining custody of children. *Id.* at \*4 (citing TEX. FAM. CODE ANN. § 153.004(c) ("The court *shall* consider the commission of family violence in determining whether to deny, restrict, or limit the possession of a child by a parent who is appointed as a possessory conservator.")) (emphasis added). Accordingly, the court held that questions regarding custody proceedings were relevant to the ex-wife's "motivation to exaggerate her testimony at trial." *Id.* Because the ex-wife's possible bias and motive as a result of the ongoing custody dispute were not made clear to the jury through thorough and effective cross-examination, the trial court abused its discretion by limiting defense counsel's cross examination. *Id.* at \*5.

Both *Ryan* and *Fox* are directly on point and persuasive authority. Gonzales testified against appellant extensively on direct examination. First, she briefly testified about the incident with which appellant was charged, indicating that Jimenez tried to get appellant's attention by "whack[ing] the phone in his hand." She then testified extensively and emotionally concerning appellant's violence towards his and Jimenez's child as Gonzales tried to get him to leave the house after Jimenez had already left. Yet appellant was expressly prohibited from asking Gonzales whether she knew there was an ongoing child custody dispute to terminate the parental rights of both Jimenez and appellant and whether Gonzales had an interest in those proceedings. He was also prohibited from asking her whether she actually or potentially stood to obtain custody of the child in the accompanying custody proceedings.

Without cross-examination, the jury in this case was deprived of facts necessary to determine Gonzales's credibility and thus to make an informed judgment as to her motivation and the weight to be placed on her testimony, which was crucial to the proof of appellant's intent to strike and injure Jimenez without justification and therefore with criminal intent. *See Davis*, 415 U.S. at 317, 94 S. Ct. at 1111; *Douglas*, 390 U.S. at 419, 85 S. Ct. at 1077. Thus, Gonzales's testimony about appellant's family violence was critical to his conviction. Moreover, had the jury agreed that appellant raised a reasonable doubt as to his defense of self-defense,

it could not have convicted him of domestic violence beyond a reasonable doubt—a mandatory consideration in determining whether he would lose custody of the child to Jimenez, Gonzales herself, or another in the then-ongoing parental rights termination proceedings. *See* TEX. FAM. CODE ANN. §§ 153.004, 153.131. Therefore, there was a direct and crucial link between the weight placed by the jury on Gonzales's testimony in appellant's trial for domestic violence and her own possible bias or interest in the parental rights termination proceedings and ultimate possession of the child. *See, e.g.*, *Van Arsdall*, 475 U.S. at 678–79, 106 S. Ct. at 1435 ("[E]xposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."); *Billodeau*, 277 S.W.3d at 42–43 ("The possible animus, motive, or ill will of a prosecution witness who testifies against the defendant is never a collateral or irrelevant inquiry, and the defendant is entitled, subject to reasonable restrictions, to show any relevant fact that might tend to establish ill feeling, bias, motive, interest, or animus on the part of any witness testifying against him"); *Carpenter*, 979 S.W.2d at 634 ("Exposing a witness' motivation to testify for or against the accused or the State is a proper and important purpose of cross-examination."); *Lewis*, 815 S.W.2d at 565 (defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose motive, bias, or interest for witness's testimony).

We hold that the trial court abused its discretion by denying appellant his constitutional right under the Confrontation Clause to question Gonzales about her interest in the outcome of ongoing parental rights termination proceedings against him and Jimenez and therefore her possible bias in testifying against him. We now determine whether the error was harmful.

## E. *Harm Analysis*

Constitutional error in a criminal case is subject to harmless error review. TEX. R. APP. P. 44.2. In such a case, the court of appeals must reverse a judgment of conviction unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *Id.* This rule is based on the parallel federal rule of criminal procedure; and, therefore, decisions of the United States Supreme Court may be looked to for guidance in interpreting the state rule. *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). Accordingly, the Court of Criminal Appeals has adopted the Supreme Court's conclusion that it is the responsibility of the appellate court to assess harm after reviewing the record. *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436–37, 115 S. Ct. 992, 994–95 (1995)).

In *Van Arsdall*, the United States Supreme Court applied the harmless error standard set out in *Chapman v. California*. *See* 475 U.S. at 680–81, 106 S. Ct. at 1436 (citing *Chapman*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967)). Under this

standard, the reviewing court must inquire whether, assuming the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say the error was harmless beyond a reasonable doubt. *Id.* at 684, 106 S. Ct. at 1438. The reviewing court looks at "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

Here, Gonzales was the State's principal witness against appellant, since Jimenez did not testify, and there were discrepancies between Gonzales's testimony and that of both appellant and Officer Portillo, who responded to Gonzales's 9-1-1 call. Her testimony contradicted appellant's description of the confrontation between himself and Jimenez. Having first testified that Jimenez "whacked" the phone in appellant's hand to get his attention, Gonzales subsequently testified that Jimenez merely "slapped the phone" in appellant's hand and that appellant then hit Jimenez in the face, knocking her back and causing her mouth to start bleeding immediately. Appellant, by contrast, testified that he "slapped" Jimenez in self-defense when Jimenez "karate kick[ed the] phone out of [his] hand," striking his hand and causing the phone to hit the car. Gonzales admitted she did not see what happened to the phone. According to Gonzales, Jimenez's mouth swelled into "a

35

big ball on her lip." Officer Portillo testified that Jimenez "had redness to the face" and a cut on her upper lip and that her eyes were watering. Gonzales also testified that appellant "kicked her car doors in" and "ransacked" the house. Appellant testified that he went into the house to get his identification and wallet when Gonzales ordered him to leave. Officer Portillo saw no evidence of ransacking or of damage to any property in the garage. Gonzales testified extensively, without rebuttal, to appellant's treatment of the child and of herself after Jimenez had left the scene in response to Gonzales's order and before appellant likewise left at Gonzales's command.

Jimenez did not testify. Therefore, the only direct witness to the confrontation between Jimenez and himself, besides appellant, was Gonzales. Appellant contends that because he could not cross-examine Gonzales for bias or interest, the jury heard only her testimony that Jimenez merely slapped the phone out of his hand "to get his attention" and his testimony, which, he contends, it could have discounted as self-serving.

Considering the *Chapman* and *Van Arsdall* standard for harmless error in denial of cross-examination under these circumstances, Gonzales' testimony was of great importance to the prosecution's case against appellant for domestic violence, and her testimony was not cumulative, as no other eyewitness present at the time of the offense testified about the confrontation between appellant and Jimenez other

36

than appellant himself, as Jimenez did not testify. *See Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438.

Most importantly, appellant's inability to confront Gonzales for bias or interest greatly affected the overall strength of the prosecution's case and of appellant's defense of self-defense. *See Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438. Appellant was charged with assault on a family member, i.e., with (1) intentionally (2) causing bodily injury (3) to another person (4) who is a member of the defendant's family or a person with whom the defendant has a "dating relationship." Tex. Penal Code Ann. § 22.01(a). Both appellant and Gonzales testified that Jimenez struck appellant's phone first. But Gonzales's testimony swiftly veered to the subsequent confrontation between her and appellant over the child and Gonzales's command that appellant leave the house. Thus, without evidence of Gonzales's interest in the child, there was nothing to support appellant's claim of self-defense in his confrontation with Jimenez other than his own testimony, testimony that was overwhelmed by Gonzales's testimony about her interest in protecting the child from appellant.

Had the jury been in possession of the facts into which appellant was forbidden to inquire on cross-examination of Gonzales, it could have made an informed judgment as to the weight to place on her testimony regarding the charged domestic violence offense—testimony which provided a crucial link to the proof of

37

both appellant's act against Jimenez and his defense of self-defense. Accordingly, we hold that the trial court's error in denying appellant the right to cross-examine Gonzales about her interest in the termination of parental rights proceedings and the attendant custody dispute was harmful to appellant's case. *See Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438; *see also* TEX. R. APP. P. 44.2(a) (stating that, in cases involving constitutional error, appellate court must reverse judgment of conviction unless court determines beyond a reasonable doubt that error did not contribute to conviction).

We sustain appellant's first issue.[4]

## Conclusion

We reverse the judgment of the trial court and remand this case for a new trial.

Evelyn V. Keyes
Justice

Panel consists of Justices Jennings, Keyes, and Brown.

Justice Brown, dissenting.

Publish. TEX. R. APP. P. 47.2(b).

---

[4] Because we sustain appellant's first issue, and therefore remand this case for a new trial, we need not address appellant's second issue concerning the exclusion of evidence of Jimenez's violent acts against Gonzales, as resolution of that issue would afford him no greater relief.

38