Yeary, J., delivered the opinion of the Court in which Keller, P.J., and Keel and Slaughter, JJ., joined, and in which Keasler, J., joined as to Parts I, III & IV, and in which Walker, J., joined as to Part II. Hervey, J., filed a concurring opinion in which Richardson and Newell, JJ., joined. Newell, J., filed a concurring opinion in which Hervey and Richardson, JJ., joined. Walker, J., filed a dissenting opinion.
Appellant was convicted of the offense of assault on a family member, and because he had previously been convicted of such an offense, this repeat offense was a third degree felony. TEX. PENAL CODE § 22.01(b)(2)(A). Appellant pled true to two additional prior felony enhancement counts, and the trial court assessed his punishment at confinement for twenty-five years in the penitentiary. TEX. PENAL CODE § 12.42(d). The court of appeals reversed the conviction, however, holding that the trial court erred in disallowing a certain line of questioning during Appellant's cross-examination of the principal witness against him, that this error was of constitutional dimension, and that it was not harmless beyond a reasonable doubt. Jones v. State , 540 S.W.3d 16, 33-35 (Tex. App.-Houston [1st Dist.] 2017). Having reversed the conviction on this basis, the court of appeals declined to address Appellant's second point of error. Id. at 35 n.4.
In its petition for discretionary review, the State contends that the court of appeals erred on both counts-in concluding both that constitutional error occurred and that any constitutional error was not harmless. We granted review of both questions, and we now reverse the court of appeals' judgment on the basis of the second, concluding that, while constitutional error did occur, it was harmless beyond a reasonable doubt.
I. BACKGROUND
A. The Incident
The indictment alleged that Appellant caused bodily injury to Amy Jimenez, with whom he had a dating relationship, by striking her with his hand. Jimenez did not testify against Appellant at trial, however. Instead, the State called Jimenez's mother, Adeline Gonzales, to testify to the incident that was the basis for the charge. Gonzales testified that she had recently moved from an apartment into a house, and that Jimenez and Appellant (Jimenez's boyfriend), and their two-year-old daughter, were living there with her. On the evening of *766 December 17, 2014, they all gathered in front of a new "huge" television to watch a movie. When a sexually explicit image appeared on the screen, Appellant made an "inappropriate" comment. Jimenez rebuked Appellant ("Hey, my mom's in the room."), and tensions flared. Gonzales retreated to her bedroom with the child, and Appellant went to the garage.
At around 10 p.m., Gonzales informed Jimenez that her daughter needed "some stuff for school[.]" Jimenez went into the garage to get the car keys from Appellant, and a "heated conversation" ensued. Gonzales, with the child in her arms, watched the interaction between Jimenez and Appellant from the kitchen doorway leading into the garage. She testified that Jimenez stood "pretty close" to Appellant, trying to get his attention, but Appellant continued focusing on his cell phone, ignoring her. Gonzales described Jimenez's reaction somewhat variably, testifying that she "whacked," "slapped," and "tapped" the cell phone in Appellant's hands. She denied that Jimenez ever "kicked" the cell phone, however. Appellant "took a swing at [Jimenez,] and he hit her in the face ... pretty hard because her whole face went back." The blow bloodied Jimenez's lip and caused it to swell up.
Seeing that Jimenez looked "scared," Gonzales instructed her to drive to her father's house, and Gonzales then called 9-1-1, asking them to "hurry." According to Gonzales, Appellant began to "ransack" the interior of the house. She elaborated: "You could hear things being thrown over." Appellant then came back into the garage, "screaming obscenities" and calling Gonzales names. He picked up a jack and began "swinging it" in close proximity to Gonzales, who was still holding the child. Gonzales demanded that Appellant leave, but he refused to do so until he could "kiss my baby." He grabbed the crying child from Gonzales and held her "like a rag doll under his arm" as she screamed and struggled. Appellant eventually put the child down, and when the police arrived, he went back into the house, then exited the back door. According to Gonzales, Jimenez did not return to the house until after the police arrived.
The State also introduced several letters that Appellant wrote to Jimenez from the jail as he awaited trial. In the letters he urged her not to show up to testify against him or, alternatively, urged her to "lie for" him. He acknowledged that Gonzales "was a witness" to the encounter, and he never made any mention of Jimenez having "kicked" him, nor did he ask Jimenez to admit that she had done so.
The first police officer to arrive at the scene, Officer Jairo Portillo, also testified. His account conflicted with Gonzales's in certain respects. For example, he testified that Jimenez was at the scene when he got there. More importantly, he rebutted Gonzales's claim that Appellant "ransacked" the interior of the house. Gonzales had insisted that she had informed the police of Appellant's destructive behavior, but Portillo saw no evidence of it in the house,[1] *767 and there was no mention of it in the police report.
Appellant's testimony was consistent with Gonzales's in many respects. The main difference was his account of Jimenez's conduct. During the hour-and-a-half in which Appellant remained in the garage playing games on his cell phone, he maintained, Jimenez came out several times "trying to pick a fight," but he ignored her. Finally, he claimed, Jimenez "kicked" the phone from his hands-a "karate kick"-causing him to drop it. According to Appellant, however, Jimenez did not just strike the phone: "She kind of hit my hand pretty hard." He readily admitted that, in response, he "slapped" Jimenez "across her face[.]" He doubted that Gonzales could have seen this exchange, however, given their respective positions in the garage. On cross-examination, he agreed with the prosecutor that Jimenez had "slapped" the phone from his hand, but when the discrepancy was pointed out to him, he insisted once again that "[s]he kicked me."
B. The Offer of Proof
Immediately before the parties made their opening statements to the jury, Appellant made it known that he desired to question Gonzales with respect to a Child Protective Services (CPS) proceeding to relinquish the parental rights of both Jimenez and Appellant. The trial court ruled that this inquiry would not be relevant, to which Appellant objected.[2] Later, at the conclusion of Gonzales's testimony, Appellant made an offer of proof:
Q. [DEFENSE COUNSEL] Do you know that there's a CPS -- that there's a child custody battle going on to eliminate parental rights of both [Jimenez] and [Appellant]?
A. [GONZALES] Yes, sir.
Q. Do you have an interest in that being done?
A. I don't understand what that means.
Q. Do you have a preference?
A. Do I have preference of what?
Q. That their parental rights be terminated or not?
A. I don't have any say in that. That damage has been done between the both of them.
Q. My understanding is the child is with an aunt; is that correct?
A. My sister.
Q. Your sister?
A. Yes. And before that, she was with me. I had her. I've always had her.
*768 Q. The reason that you take care of the child is because of the relationship that [Appellant] and [Jimenez] have, correct?
A. I'm sorry?
Q. It's because of the type of relationship that [Jimenez] and [Appellant] have and the things that they do destructive towards each other, correct?
A. I'm not sure I want to answer that.
Q. The reason -
A. Yes, that's why I take care of her because I want her to be safe. She's a beautiful little girl. She deserves to be safe. (Witness crying.)
C. On Direct Appeal
Appellant argued on direct appeal that the trial court violated his Sixth Amendment right to confront the witnesses against him by prohibiting cross-examination with respect to Gonzales's knowledge, and potential interest in the outcome, of the CPS proceedings respecting the termination of Appellant's and Jimenez's parental rights. The court of appeals first held that Appellant properly preserved this issue for appeal, Jones , 540 S.W.3d at 23-25, and we have no occasion to revisit that determination. On the merits, the court of appeals held that "the trial court abused its discretion by denying [A]ppellant his constitutional right under the Confrontation Clause to question Gonzales about her interest in the outcome of ongoing parental rights termination proceedings against him and Jimenez and therefore her possible bias in testifying against him." Id. at 33. Because Gonzales was such a "crucial link" in the State's case, the court of appeals explained, it could not conclude beyond a reasonable doubt that the constitutional error was harmless. Id. at 35.
II. ERROR?
The State now argues that the court of appeals erred to hold that Appellant's offer of proof was sufficient to justify the cross-examination that he sought. According to the State, "[w]hat is missing is a logical connection between" the proceedings to terminate Appellant's and Jimenez's parental rights and Gonzales's trial testimony "that would suggest an actual bias, namely that [her] desire to keep [Appellant's daughter] safe had led her to involve herself in the custody case." State's Brief on the Merits at 11. We disagree.
Speaking of the defendant's right to cross-examine an adverse witness in the seminal case of Alford v. United States , 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), the United States Supreme Court observed:
Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and credibility to a test, without which the jury cannot fairly appraise them. To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial.
Id. at 692 (citations omitted). See *769 Carroll v. State , 916 S.W.2d 494, 497 (Tex. Crim. App. 1996) (citing Alford for the proposition that "the defendant should be granted a wide latitude even though he is unable to state what facts he expects to prove through his cross-examination").
We have observed:
The failure to affirmatively establish the fact sought does not prevent the cross-examination from having probative value in regard to the witness' credibility. An unbelievable denial of the existence of a fact can be even more probative as to lack of credibility than an affirmative admission of the fact.
Spain v. State , 585 S.W.2d 705, 710 (Tex. Crim. App. 1979) ; see also Carroll , 916 S.W.2d at 500 (quoting Spain ). The proposition from Spain that a defendant need not secure an admission of bias to justify broaching the subject in cross-examination has since been implicitly ratified in Rule 613(b) of the Texas Rules of Evidence. TEX. R. EVID. 613(b). Rule 613(b) reflects the reality that a biased witness may well deny that the circumstances gave him a motive to testify falsely.[3] But the rule just as plainly contemplates that the witness may nevertheless be questioned about the potential for bias so engendered.
It is true, as the State emphasizes, that more recent case law since Spain has required a "logical relationship" or "causal connection": a showing by the proponent of the cross-examination that the circumstances he wishes to call to the witness's attention in fact give rise to an inference of undue influence or bias-even if the witness denies any actual shading of his testimony. See Carpenter v. State , 979 S.W.2d 633, 634 (Tex. Crim. App. 1998) ("For the evidence to be admissible, the proponent must establish some causal connection or logical relationship between the pending charges and the witness' ... potential bias or prejudice for the State[.]"); Irby v. State , 327 S.W.3d 138, 147 (Tex. Crim. App. 2010) (same); Johnson v. State , 433 S.W.3d 546, 552 (Tex. Crim. App. 2014) (same). Such a principle cannot be applied too rigorously, however, since, "generally speaking, the Texas Rules of Evidence permit the defendant to cross-examine a witness for his purported bias, interest, and motive without undue limitation or arbitrary prohibition." Hammer v. State , 296 S.W.3d 555, 563 (Tex. Crim. App. 2009). Too strict an adherence to this "logical relationship"/"causal connection" principle would undermine Alford 's constitutional mandate-and Rule 613(b)'s implicit assumption-that a defendant be permitted to explore any plausible basis for witness bias, whether or not the witness is willing to admit to it.
Appellant's offer of proof in this case was perhaps less than ideally thorough. It would have been preferable for Appellant to squarely ask Gonzales whether she actually had any hope or expectation of obtaining custody of Appellant's daughter in the event that parental rights were terminated, and whether she believed that her testimony against Appellant in his criminal trial would facilitate that eventuality. He might also have asked Gonzales whether it was at least her goal to place Appellant's daughter with anyone other than Appellant-including Gonzales's sister. But the fact of the matter is that it would not have mattered how she answered these questions in the offer of proof. Both Rule 613(b) and the Sixth Amendment contemplate that Appellant should be able to ask her these questions in the jury's presence so that it could *770 gauge the plausibility of her response. If the jury should disbelieve her denial, that would have provided some justification for taking her testimony with a grain of salt. Spain , 585 S.W.2d at 710.
The record demonstrated that Gonzales was aware that CPS was involved in child custody proceedings that could affect Appellant's future custody of his daughter. It demonstrated that Gonzales had an interest in the child's safety and that she did not think the child was safe in Appellant's custody. It demonstrated that Gonzales often took care of the child, and that the child was in the temporary custody of Gonzales's sister at the time of trial. It would take no great leap of logic for a jury to infer that Gonzales was motivated by the hope or expectation that, if Appellant were convicted of this offense, it would diminish his chances of retaining custody of his daughter. Gonzales's awareness of the pending termination-of-parental-rights proceeding created a sufficient "logical relationship"/"causal connection" to invoke Appellant's Sixth Amendment right to cross-examine her for potential bias.[4] We agree with the court of appeals that he should have been permitted to address Gonzales' attitude about the parental termination proceedings in the jury's presence.
III. HARM?
Applying the harm factors from Delaware v. Van Arsdall , 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the court of appeals concluded that the constitutional error was not harmless beyond a reasonable doubt.[5] See Jones , 540 S.W.3d at 33-35 ; TEX. R. APP. P. 44.2(a) (in light of constitutional error, reviewing courts must reverse "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment"). Gonzales was the State's only witness to the actual assault. Her testimony was not cumulative of any other State's evidence, nor was it corroborated (other than to the extent it matched up with Appellant's). Because Jimenez, the complaining witness, did not testify, Gonzales's testimony was indispensable if the State was going to be able to convict Appellant. The case essentially devolved into a swearing match between Gonzales and Appellant about the circumstances surrounding the assault. Thus, most of the Van Arsdall factors appear to militate in favor of the court of appeals' conclusion that the error was not harmless beyond a reasonable doubt.
And yet, we ultimately cannot agree with the court of appeals that Appellant *771 was harmed. Appellant testified and admitted that he struck Jimenez.[6] The only material difference between Appellant's account and Gonzales's was their respective descriptions of Jimenez's initial assault upon Appellant which gave rise to Appellant's claim of self-defense. Gonzales claimed Jimenez "whacked" or "slapped" the cell phone that was in Appellant's hand. Her testimony varied slightly from direct- to cross-examination with respect to whether this caused Appellant to drop the cell phone, but she never said Jimenez struck Appellant's hand. On direct examination, she testified that she did not see whether the cell phone dropped. On cross-examination, however, she agreed that Jimenez's blow did suffice to knock the cell phone out of Appellant's hand. By contrast, Appellant testified that Jimenez "karate-kicked" his hand, causing the cell phone to drop. Gonzales denied that Jimenez ever kicked either Appellant or his cell phone. Appellant testified that he doubted Gonzales could even have seen what happened from her particular vantage in the garage.
Nothing about this particular dispute could likely have dictated the outcome of the jury's resolution of Appellant's self-defense claim. The jury was instructed that, in order to find that Appellant struck Jimenez in self-defense, it must find that her initial attack upon him "created" in his mind "a reasonable expectation or fear of some bodily injury." See TEX. PENAL CODE § 9.31(a) ("[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use of unlawful force."). The jury's resolution of the reasonableness of Appellant's belief (if any) that Jimenez was about to cause him bodily injury would not likely have turned on the subtle difference between Gonzales's account of Jimenez's conduct and his own. Under either account, the jury would likely have concluded that Jimenez struck at Appellant hard enough to knock the phone out of his hand, whether she also struck his hand in the process or not. Moreover, whether she dealt the blow with her own hand or with a "karate kick" does not seem to be a distinction that would likely sway the jury's assessment of the reasonableness of Appellant's apprehension that unlawful force was "immediately necessary" to protect himself.
In any event, any cross-examination to expose Gonzales's potential bias would *772 only marginally have increased the damage already inflicted upon her general credibility by other evidence that the jury was permitted to hear. Her testimony that Appellant ransacked the house was contradicted by Officer Portillo's testimony that he saw no evidence of ransacking. And, what is more, the jury would have perceived a potential for bias on Gonzales's part inherent in the simple fact that she was both the victim's mother and the child's grandmother. That Gonzales had an interest in assuring that Appellant did not retain custody of the child would only have added incrementally to the jury's perception of her as an interested witness of questionable reliability. We are confident beyond a reasonable doubt that the jury would have rejected Appellant's self-defense claim even had it been made aware of the more particularized reasons to question Gonzales's motives in testifying.
IV. CONCLUSION
Accordingly, we reverse the judgment of the court of appeals and remand the cause to that court for disposition of Appellant's remaining point of error.
Hervey, J., filed a concurring opinion in which Richardson and Newell, JJ., joined.
Appellant, Dedric D'Shawn Jones, was charged with family-violence assault with a previous conviction for attacking his girlfriend, Amy Jimenez. Jimenez's mother, Adeline Gonzales, saw the incident, and she testified against Jones at trial, but Jimenez did not testify.[1] At the time of the offense, Jones and Jimenez had a one-year-old child, Alice,[2] and during Jones's trial, there were on-going Child Protective Services (CPS) proceedings to terminate their parental rights. Defense counsel wanted to cross-examine Gonzales about whether she was aware of the termination proceedings and whether she might be biased against Jones because she wanted custody of Alice or, at least, wanted Jones's parental rights terminated. The trial court denied the request, but it allowed defense counsel to make an offer of proof. Jones was convicted, but he appealed. The court of appeals held that the trial court erred and that the error was harmful. The State filed a petition for discretionary review, arguing that the court of appeals's analysis was flawed.
Today, the majority holds that Gonzales was subject to cross-examination for potential bias because she was aware that there were on-going CPS termination proceedings against the defendant. I not only disagree with the majority's reasoning, I also fear that it opens Pandora's Box, paving the way for any defendant to cross-examine any third-party witness who testifies against a defendant and is aware of on-going termination proceedings against the defendant.
FACTS
Jones was dating Jimenez, and they shared a room in Gonzales's home. The night in question, Gonzales and Jimenez had been working while Jones was at home taking care of Alice and painting the house. When Jimenez and Gonzales returned home, they ordered pizzas for dinner and watched a movie on Netflix. During an explicit scene, Jones made an inappropriate comment, which upset Jimenez and Gonzales. Gonzales went to a bedroom with Alice, and Jimenez and Jones argued for a few minutes before Jones *773 went into the garage and played a video game on his phone. According to Jones, he was in the garage for between an hour to one and a half hours, and during that time, Jimenez came into the garage to talk to him numerous times, but he ignored her. The last time she went to talk to Jones, Jimenez "got in his face," Jones said, and was yelling at him when she suddenly "karate kicked" the phone out of his hands. While Jimenez and Jones were arguing, Gonzales opened the kitchen door to walk into the garage and saw Jimenez "whack" the phone out of Jones's hand with one of her hands and Jones slap Jimenez. According to Gonzales, Jimenez was bleeding from her mouth and lip, but Jones said that he doubted that the slap drew blood.
After the altercation, Jimenez left, and Gonzales told Jones to leave, but she said that he went back into the house and that it sounded like he was "ransacking everything." When Jones went back into the garage, Gonzales said that he was "[s]creaming obscenities, calling me everything in the book and ransacking what he could." According to her, as Jones was screaming, he kicked in the doors to her car and then picked up a car jack and started swinging it near her and Alice. After Jones put the car jack down, he said that he would not leave until he got to "kiss his baby," and he cornered Gonzales and grabbed one of Alice's legs. Gonzales said that "it scared me, because I said, My God, he could have ripped her spinal cord. I let her go." Gonzales claimed that when Jones walked away, he was holding Alice "like a rag doll under his arm. And she was crying and crying. He's screaming." She also said that Alice was pushing away from Jones and screaming "this loud cry like I never heard it before." Jones put Alice down as he was leaving, and Gonzales ran to her and picked her up.
After Jones left, Gonzales testified that she went back into the house, and she saw that Jones had rifled through Jimenez's things and that he had turned everything "upside down." Jones denied ransacking anything. Officer Jairo Portillo was dispatched, and when she arrived on-scene, she looked inside the house and garage, but contrary to Gonzales's testimony, she did not notice that any property had been disturbed.
TRIAL
Jones was arrested and charged with family-violence assault, a Class A misdemeanor, but the charge was elevated to a third-degree felony because he had been previously convicted of family-violence assault. TEX. PENAL CODE § 22.01(b)(2)(A). The State also alleged that Jones was a habitual offender.[3] Id. § 12.42(d). As a habitual offender, he faced a minimum of 25 years' confinement. Id.
At a pretrial hearing, defense counsel sought to ask Gonzales about Jimenez's history of violence, about whether Gonzales knew that there were on-going CPS termination proceedings, and about whether she had an interest in the outcome of those proceedings. The State argued that Jones should not be allowed to pursue that line of questioning because Alice was living with her aunt, and if Gonzales "had something to benefit from this, I would think that by now, almost a year later, she would have." The trial judge sustained the State's objection, stating that "the CPS investigation and any potential outcomes are not relevant to this trial and in fact would be more prejudic[ial] to [Jones]." The last *774 comment about the matter was from defense counsel, who said, "All right. Please note our objection."
During cross-examination of Gonzales, defense counsel again asked to question Gonzales about Jimenez's violent past, but the judge denied the request and said that defense counsel could make an offer of proof after the jury was excused for lunch. After the jury was excused, defense counsel asked Gonzales about Jimenez's history of violence and about the on-going CPS proceedings. The following excerpt is the entirety of the offer of proof with respect to the CPS proceedings issue,
[DEFENSE]: Do you know that there's a CPS -- that there's a child custody battle going on to eliminate parental rights of both Amy and Dedric?
[GONZALES]: Yes, sir.
[DEFENSE]: Do you have an interest in that being done?
[GONZALES]: I don't understand what that means.
[DEFENSE]: Do you have a preference?
[GONZALES]: Do I have preference of what?
[DEFENSE]: That their parental rights be terminated or not?
[GONZALES]: I don't have any say in that. That damage has been done between the both of them.
[DEFENSE]: My understanding is the child is with an aunt; is that correct?
[GONZALES]: My sister.
[DEFENSE]: Your sister?
[GONZALES]: Yes. And before that, she was with me. I had her. I've always had her.
[DEFENSE]: The reason that you take care of the child is because of the relationship that Dedric and Amy have, correct?
[GONZALES]: I'm sorry?
[DEFENSE]: It's because of the type of relationship that Amy and Dedric have and the things that they do destructive towards each other, correct?
[GONZALES]: I'm not sure I want to answer that.
[DEFENSE]: The reason --
[GONZALES]: Yes, that's why I take care of her because I want her to be safe. She's a beautiful little girl. She deserves to be safe. (Witness crying.)
[DEFENSE]: In this particular case, it is your testimony that Amy hit Dedric first, correct?
[GONZALES]: She slapped the phone in his hands.
[DEFENSE]: Nothing further.
[COURT]: Anything, [from the State]?
[STATE]: No, Your Honor.
[COURT]: All right. You're excused. You may step down. Please wait out in the witness room.
The State called two more witnesses before resting its case, and the defense called Jones as its only witness. He admitted that he slapped Jimenez after she "karate kicked" the phone out of his hand, but he never expressly claimed that he slapped Jimenez in self-defense. At the jury charge conference, defense counsel asked for a "mutual combat" instruction.[4] Ultimately, a *775 self-defense, apparent-danger instruction was included in the jury charge.
The jury convicted Jones, and he pled true to the enhancement paragraphs. The jury sentenced him to 25 years' confinement as a habitual offender, but it did not fine him.
DISCRETIONARY REVIEW
The State filed a petition for discretionary review, which the Court granted. It asks us to decide whether the court of appeals erred in finding a Confrontation Clause violation and whether the lower court's harm analysis was flawed because it did not consider the weakness of the self-defense evidence. After carefully reviewing the record, I conclude that the trial court did not err when it limited Jones's cross-examination of Gonzales because Jones did not establish a logical connection between the excluded evidence and Gonzales's alleged bias. Consequently, I do not address the lower court's harm analysis.
STANDARD OF REVIEW
The trial court has broad discretion to limit the extent of cross-examination, but it abuses its discretion when it prevents appropriate cross-examination. Carroll v. State , 916 S.W.2d 494, 498 (Tex. Crim. App. 1996).
THE RIGHT TO CONFRONTATION
a. Law
The Sixth Amendment states that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." U.S. CONST. amend. VI. One interest protected by the Confrontation Clause is the right of cross-examination. Davis v. Alaska , 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). An important aspect of the right is the ability to expose a witness's motivation to testify, and a witness's potential bias is always subject to investigation and is " 'always relevant as discrediting the witness and affecting the weight of his testimony.' " Id. at 316-17, 94 S.Ct. 1105 (quoting 3A John H. Wigmore, EVIDENCE IN TRIALS AT COMMON LAW § 940, at 775 (Chadbourne rev. 1978) ). "The cross-examiner should be allowed to expose the limits of the witness'[s] knowledge of relevant facts, place the witness in his proper setting, and test the credibility of the witness. The failure to affirmatively establish the alleged bias or motive does not prevent the cross-examination from having probative value in regard to the witness'[s] credibility." Spain v. State , 585 S.W.2d 705, 710 (Tex. Crim. App. [Panel Op.] 1979). We have said that a defendant can establish a basis for cross-examination about potential witness bias by showing a logical or causal connection between the source of the claimed bias and the witness's testimony at trial. See Carpenter v. State , 979 S.W.2d 633, 634 (Tex. Crim. App. 1998).
b. Analysis[5]
I disagree with Jones, and the majority, that the evidence in this case shows a logical connection. Nothing in the record suggests that Gonzales testified against Jones because she was aware that her *776 testimony could increase the chances that Jones's parental rights would be terminated or increase the chances that she might obtain custody of Alice. But the majority explains that "Gonzales's awareness of the pending termination-of-parental-rights proceeding created a sufficient 'logical relationship'/'casual connection' to invoke Appellant's Sixth Amendment right to cross-examine her for potential bias." Maj. Op. at 770.
The majority seems to think that a defendant is guaranteed the right to cross-examine a witness in "whatever way, and to whatever extent, the defense might wish." Van Arsdall , 475 U.S. at 679, 106 S.Ct. 1431 (quoting Delaware v. Fensterer , 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam) ). But that is not the law. As the Supreme Court stated in Van Arsdall , the Confrontation Clause guarantees only an opportunity for effective cross-examination. Appellant was given the opportunity to cross-examine Gonzales about her potential bias by adducing testimonial and/or documentary evidence during the offer of proof to establish a basis for such cross-examination, but Appellant did not adequately avail himself of that opportunity. The offer of proof in this case is not just inartful, as the majority asserts; it is fatally defective.
Justice Brown, who dissented from the majority of the court of appeals, hypothesized numerous ways in which Jones could have further developed his offer of proof and established a basis to cross-examine Gonzales about her alleged bias,
Jones's offer of proof failed to address a variety of other highly relevant, related circumstances from which a factfinder might infer that Gonzales believed the CPS proceedings could result in her obtaining custody of Alice and was therefore potentially biased. There is no evidence that Gonzales had been interviewed by CPS, was scheduled to be a witness in the CPS proceeding, knew the claims made by CPS, or was otherwise involved in the termination proceedings. There is no evidence that Gonzales knew the status of the CPS proceedings or why the proceedings were instigated; knew any of the law regarding parental-termination proceedings; or knew how a conviction against Jones might affect the termination proceedings. Nor is there any evidence that Gonzales believed she had the financial, physical, and legal ability to be granted custody of Alice when Alice was at the time in the custody of her great-aunt.
Jones , 540 S.W.3d at 40-41 (footnote omitted) (Brown, J., dissenting). I wholeheartedly agree with Justice Brown's comments.
The State argues that the court of appeals's opinion "could be used as the basis for requiring baseless, prejudicial cross-examination of third-party witnesses in any family-violence case whe[n] the defendant and complainant are co-parents." State's Brief on the Merits at 9. The court of appeals's opinion might be so limited, but it does not appear that this Court's decision is that limited. In its own words, this Court's decision-precedent binding on all lower courts in Texas-appears to allow for baseless, prejudicial cross-examination in any case so long as any of the State's witness knows about on-going CPS proceedings to terminate the defendant's parental rights.[6] Maj. Op. at 770 ("Gonzales's *777 awareness of the pending termination-of-parental-rights proceeding created a sufficient 'logical relationship'/'casual connection' to invoke Appellant's Sixth Amendment right to cross-examine her for potential bias."). Unfortunately, today's decision will undoubtedly invite defendants to file meritless appeals.
CONCLUSION
I conclude that the court of appeals erred when it held that Appellant's right to confrontation was violated, and I dissent from the majority's affirmation of that holding, but because the majority ultimately concludes that Appellant is not entitled to relief, I concur in the result.
Newell, J., filed a concurring opinion in which Hervey and Richardson, JJ., joined.
There's a danger of losing sight of what the trial judge actually did in this case. The trial court ruled that Appellant could not cross-examine the complainant's mother, Adeline Gonzales, about the existence of a CPS investigation and whether Gonzales stood to get the complainant's and Appellant's baby girl if parental rights were terminated. Later, Appellant made an offer of proof that contained some questions about the termination proceedings, but it also contained questions about Gonzales's care for the child and Gonzales's desire to protect her. I do not see where the trial judge prevented Appellant from asking about these new subjects. Appellant never sought to obtain a ruling from the trial judge about whether he could cross-examine Gonzales in front of the jury about this extra information elicited during the offer of proof. And the trial judge never prevented Appellant from cross-examining Gonzales about her possible bias or motive stemming from her desire to keep the child safe. The trial judge only held that Appellant could not introduce evidence of the termination proceedings and any potential outcomes of such proceedings. Without any evidence that Gonzales had some direct interest in the outcome of the termination suit, I agree with the trial court. That is why I concur in the judgment.
Preservation of Error and Offers of Proof
I agree with the court of appeals that Appellant preserved error regarding a limitation on his ability to cross-examine Gonzales about the CPS proceedings. But the only ruling the trial court made was about questions regarding that proceeding.
THE COURT: I'm going to find the CPS investigation and any potential outcomes are not relevant to this trial and in fact would be more prejudice to the defendant.
Later, after Gonzales had finished testifying, Appellant made an offer of proof that elicited testimony beyond the trial court's ruling.
Q. Do you know that there's a CPS -- that there's a child custody battle going on to eliminate parental rights of both [the complainant] and [Appellant]?
A. Yes, sir.
...
Q. Do you have a preference?
A. Do I have preference of what?
Q. That their parental rights be terminated or not?
*778 A. I don't have any say in that. That damage has been done between the both of them.
Q. My understanding is the child is with an aunt; is that correct?
A. My sister.
Q. Your sister?
A. Yes. And before that, she was with me. I had her. I've always had her.
Q. The reason that you take care of the child is because of the relationship that [Appellant] and [the complainant] have, correct?
A. I'm sorry?
Q. It's because of the type of relationship that [the complainant] and [Appellant] have and the things that they do destructive towards each other, correct?
A. I'm not sure I want to answer that.
Q. The reason -
A. Yes, that's why I take care of her because I want her to be safe. She's a beautiful little girl. She deserves to be safe. (Witness crying.)
The only information about the termination proceedings elicited in the offer of proof was Gonzales's awareness of a termination proceeding against Appellant and her statement that she didn't have "any say" in the outcome of that proceeding. After Appellant made his offer of proof, he did not seek a ruling from the trial judge regarding whether he could cross-examine Gonzales about her caring for the child and wanting to keep the child safe due to the toxic relationship between Appellant and the complainant.
To preserve error regarding the exclusion of evidence, a party is required to make an offer of proof and obtain a ruling.[1] Here, Appellant obtained a ruling, and later made an offer of proof that went beyond that ruling. While an offer of proof can provide an opportunity for a trial court to reconsider its original ruling, Appellant never asked the trial court to do that.[2] Nevertheless, the court of appeals in this case seems to have held that the trial court's ruling covers all the information in the offer of proof.[3] I agree with the court of appeals that no second objection was needed to preserve error regarding a limitation on the questioning about the termination proceedings, but it is not at all clear that an offer of proof can unilaterally expand an earlier ruling by the trial court.
This is significant in this case because it is one thing to argue that Gonzales would shade her testimony out of a desire to keep the child safe. It is another to say that she would shade her testimony to potentially influence a collateral proceeding. So much of the rhetorical force of the court of appeals' and this Court's holdings seems to come from a concern that Appellant was not allowed to question Gonzales about her desire to keep the child safe. Appellant could have easily elicited that information without discussing the child-termination proceeding, which carried with it the potential prejudice attendant to asking the jury to speculate about Gonzales's motive to influence the outcome of a collateral proceeding.
Our New "Logical Leap" Test
The scope of appropriate cross-examination is necessarily broad.[4] A defendant is *779 entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias, or interest for the witness to testify in a particular manner.[5] The Sixth Amendment right of confrontation is violated when appropriate cross-examination is limited.[6] But the confrontation clause does not prevent a trial judge from imposing some limits on defense counsel's inquiry into the potential bias of a prosecution witness. Trial judges retain wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, witness safety, or interrogation that is repetitive or only marginally relevant.[7]
Prior to this case, we have held that cross-examining a witness about a collateral proceeding required a predicate showing of a "causal connection" between the collateral proceeding and the possible bias of the testifying witness. But these cases all involved cross-examination of witnesses who had a direct interest in the outcome of the collateral proceeding, and that direct interest was supported by some evidence. For example, Spain v. State dealt with the cross-examination of a witness about that witness's probated sentence for his role in the same offense that the defendant had been charged with.[8] In Carpenter v. State , we considered whether a defendant could cross-examine a witness about pending federal charges.[9] And in Irby v. State , we considered whether a defendant had a constitutional right to cross-examine a witness about his status as a juvenile probationer.[10] In all these cases, the existence of a "causal connection" was determined by reviewing the facts about the collateral proceeding, not by searching for an admission of bias or motive from the witness. As we explained in Irby , the "causal connection" requirement is a matter of simple relevance, whereby a cross-examiner must show a logical connection between a fact or condition that could give rise to a potential bias or motive.[11] The question has always been whether the witness's interest in the collateral proceeding gives rise to an inference of bias, not the other way around.
Here, the Court focuses on whether Appellant was required to secure an admission of bias or motive from Gonzales in the offer of proof, rather than on whether there were sufficient facts regarding the termination proceedings to infer bias on the part of Gonzales. According to the Court, "[i]t would take no great leap of logic for a jury to infer that Gonzales was motivated by the hope or expectation that, if Appellant were convicted of this offense, it would diminish his chances of retaining custody of his daughter."[12] But we don't know anything about the termination proceedings except that they exist. There are many different justifications for seeking the termination of parental rights; we don't even know whether the termination proceedings were initiated in response to the offense at issue in this case. Moreover, there is no evidence suggesting Gonzales has any direct interest in the outcome of the termination proceeding. In Carpenter , the simple existence of pending federal *780 charges did not establish a causal connection between the collateral proceeding and the witness's motive to testify.[13] Yet in this case, Gonzales's simple awareness of the collateral proceeding is enough to establish relevance of testimony about the collateral proceeding. Without any evidence that Gonzales was named or even sought to be named as a possible caretaker for the child in the termination proceeding, I don't see how the Court can square this opinion with Carpenter .
Indeed, after this case, we are no longer looking for a "causal connection"; we are evaluating the size of the leap from a witness's motive to shade his or her testimony to the collateral proceeding. I fear this new "logical leap" test places the emphasis on how biased the witness appears to the trial court, or the reviewing court, rather than on the existence of facts from which bias may be inferred. And under this test, I don't see any reason why a defendant would be prevented from questioning a witness about any pending criminal charge, the chance for parole, or the witness's status as a probationer, even though we have already upheld limitations upon inquiries in each of these areas.[14] For example, it takes no great logical leap to infer that a witness who is in prison might shade his or her testimony out of the hope that favorable testimony for the State might result in early release, yet we have previously held otherwise.[15] That is why I would require a showing that the witness has some direct interest in the outcome of the termination suit such as being named as a possible managing conservator for the child before allowing cross-examination about that type of collateral proceeding.
Conclusion
Ultimately, this case is probably best understood as a "we would have let it in" case. Had I been the trial judge evaluating the offer of proof, I probably would have clarified that Appellant was free to question Gonzales about her love for her grandchild and her desire to keep that child safe. But this isn't a call on the field; it's a booth review. Consequently, I am unwilling to second-guess the trial judge for her reasonable, and constitutionally permissible, limitation on cross-examination.
Walker, J., filed a dissenting opinion.
I agree with the Court that the trial court's exclusion of Appellant's sought-after line of cross-examination was erroneous, and I join Part II of the Court's opinion. However, I disagree with the Court's conclusion that the error was harmless. There was harm in the exclusion, and I would affirm the decision of the court of appeals. I disagree with the *781 Court's decision to reverse and remand, and I respectfully dissent.
I - Harmless Error of Limitations on Cross-Examination
The improper limitation of cross-examination violates the Confrontation Clause of the United States Constitution and is subject to review for harmless error. Delaware v. Van Arsdall , 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ; Tex. R. App. P. 44.2(a) (constitutional error is subject to harmless error review). Under the harmless error standard, errors must be reversed unless the reviewing court determines, beyond a reasonable doubt, that the error did not contribute to the conviction or punishment. Chapman v. California , 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ; Tex. R. App. P. 44.2(a). If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt. Rubio v. State , 241 S.W.3d 1, 3 (Tex. Crim. App. 2007).
The focus of the harmless error test should not be on the propriety of the outcome of the trial. Love v. State , 543 S.W.3d 835, 846 (Tex. Crim. App. 2016). Instead, the probable impact of the error on the jury, in light of all other evidence available, should be calculated. Id. Evidence of the defendant's guilt should be considered, but that is only one factor in the analysis. Rubio , 241 S.W.3d at 3. The question is not whether the legally admitted evidence was sufficient to support the verdict, but rather whether the State has proved, beyond a reasonable doubt, that the error did not contribute to the verdict obtained. Satterwhite v. Texas , 486 U.S. 249, 258-59, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).
When the question is harmless error due to the improper limitation of cross-examination, reviewing courts apply a three prong analysis. Shelby v. State , 819 S.W.2d 544, 547 (Tex. Crim. App. 1991). First, reviewing courts should assume that the damaging potential of the desired cross-examination was fully realized. Van Arsdall , 475 U.S. at 684, 106 S.Ct. 1431 ; Shelby , 819 S.W.2d at 547.
Second, with that assumption in mind, reviewing courts then ask whether the admission of that impeachment evidence, in the context of the trial as a whole, would have likely made any significant impact upon the minds of an average jury. Davis v. State , 203 S.W.3d 845, 850 (Tex. Crim. App. 2006). To decide that question, courts review the error in connection with the following factors: (1) the importance of the witness's testimony to the State's case; (2) whether the witness's testimony was cumulative; (3) the absence or presence of corroborating or contradicting testimony of the witness on material points; (4) the extent of cross-examination of the witness otherwise permitted; and (5) the overall strength of the State's case. Van Arsdall , 475 U.S. at 684, 106 S.Ct. 1431 ; Shelby , 819 S.W.2d at 547.
Finally, in light of the first two prongs, reviewing courts must consider whether the error was harmless beyond a reasonable doubt. Shelby , 819 S.W.2d at 547. The reviewing court must determine whether it is convinced, beyond a reasonable doubt, that the fact-finding process was reliable even if the improperly restricted or excluded evidence is factored into the analysis. Davis , 203 S.W.3d at 850. To perform this analysis, reviewing courts must review the facts of the case and the excluded evidence. Love v. State , 861 S.W.2d 899, 904 (Tex. Crim. App. 1993).
II - The Damaging Potential
Beginning with the first step of the analysis, the damaging potential of Appellant's sought-after cross-examination of Gonzales for bias should be assumed.
*782 Van Arsdall , 475 U.S. at 684, 106 S.Ct. 1431 ; Shelby , 819 S.W.2d at 547.
Appellant's line of cross-examination would have shown that Gonzales knew of the ongoing child custody proceedings to terminate Appellant's and Jimenez's parental rights to the child. Cross-examination would have also shown that Gonzales believed that damage had been done by both Appellant and Jimenez to their parental rights to the child. The jury would have also learned that, despite the child's current placement, Gonzales previously always had possession of the child. The jury would have heard that Gonzales believed the child deserved to be safe, that Gonzales wanted the child to be safe, and that Gonzales takes care of the child because she wanted the child to be safe.
It is true that the offer of proof made by defense counsel did not clearly establish that Gonzales had an interest in the outcome of the ongoing child custody proceedings. However, it was not necessary that Gonzales fully admit her interests and her biases. Indeed, rarely will a witness readily admit that he or she is coloring testimony because of an interest in a particular outcome in the case. What did make it into the record during the offer of proof was, in my opinion, sufficient to establish actual bias, not just potential bias. Even so, it is reasonable to infer, from Gonzales's desire for the child to be safe, and the fact that Gonzales cared for the child because she wanted the child to be safe, that Gonzales wanted to have possession or custody of the child. How else can she ensure the child's safety? Additionally, her evasiveness and non-answers to the questions, though they do not directly indicate an interest and a bias, show that Gonzales was being evasive and would not answer questions regarding her potential biases. This was despite her testimony to the jury which was rich in detail about the confrontation between herself and Appellant, the tug-of-war over the child, and Appellant's ransacking of the house.[1] The jury would have taken Gonzales's sudden evasiveness and inability to answer these particular questions as showing she was hiding something about the topic.
At the very least, cross-examination would have exposed that Gonzales's desire for the child to be safe meant that, because she believed Appellant and Jimenez were damaging to the child, Gonzales had an interest in the termination of Appellant's and Jimenez's parental rights. Of course, the offer of proof did not establish that a conviction in Appellant's case would have led to the termination of his parental rights. However, the offer of proof did show that she was aware of the possibility. In response to counsel's question whether Gonzales had a preference that Appellant and Jimenez have their parental rights terminated, Gonzales responded that she did not have a say in that decision. She acknowledged the possibility of termination, even though the decision as to whether to terminate was out of her hands.
I will note that questioning in cross-examination is normally much more thorough than questioning in an offer of proof, and I am certain that this would have been the case with Appellant's trial counsel. Good trial attorneys, in an offer of proof, ask a prosecution witness only enough questions to convince the trial judge that the cross-examination should be allowed. The trial attorney would not become confrontational with the witness until the jury was present so as to take the witness by *783 surprise in front of the jury. In a cross-examination before the jury, the attorney would start out, much like Appellant's trial counsel did in the offer of proof, by asking questions in a cordial and non-confrontational manner. Then, after the witness has told her story, the attorney would have the witness go over the subject again, but this time in a confrontational manner in order to impart the attorney's skepticism of the witness onto the jury. As the cross-examination progresses, questions become leading statements to which the witness can only answer "yes" or "no." The attorney's questions to key issues are asked in such a way that the attorney does not care if the answer is yes or no, and he actually hopes the witness is more and more untruthful as the questioning continues. I strongly feel that if the trial court allowed Appellant's desired cross-examination, by the end of cross-examination the jury would have had serious doubts about Gonzales's credibility as to the potential bias which would also spill over to her assertion that Appellant intentionally hit Jimenez.
A full realization of the damaging potential would mean that the jury would have been aware of Gonzales's bias. The jury would have recognized that Gonzales was hiding the ball in regards to herself, and the jury would have recognized that Gonzales was saying everything she needed to in order to paint Appellant as an unfit father and ensure his conviction. The jury would have found her non-credible, and the jury would have discounted her testimony.
III - The Van Arsdall Factors
The second step of the analysis takes the assumption of damage, and considers the impact of that damage on the rest of the case in light of the factors identified in Van Arsdall . Van Arsdall , 475 U.S. at 684, 106 S.Ct. 1431 ; Shelby , 819 S.W.2d at 547. Considering the Van Arsdall factors, the court of appeals noted first that Gonzales's testimony was of great importance to the State's case. Jones v. State , 540 S.W.3d 16, 34 (Tex. App.-Houston [1st Dist.] 2017, pet. granted). Jimenez did not testify, and the only eyewitness, other than Appellant himself, was Gonzales. Id. For the same reason, the court of appeals also found that Gonzales's testimony was not cumulative, because no other eyewitness present at the time of the offense testified about the confrontation between Appellant and Jimenez, other than Appellant himself, as Jimenez did not testify. Id.
On the third Van Arsdall factor, the presence or absence of corroborating or contradicting testimony, the court of appeals identified discrepancies between Gonzales's testimony and Appellant's testimony. Id. Appellant testified that he slapped Jimenez in self-defense after Jimenez karate kicked the phone he was holding, striking his hand and causing the phone to hit the car. Id. In contrast, Gonzales said Appellant struck Jimenez after Jimenez either whacked the phone or merely slapped the phone. Id. With regard to Officer Portillo's testimony, the court of appeals noted that Gonzales testified that Jimenez's mouth had swollen into a big ball on her lip. Id. Officer Portillo testified that Jimenez had redness to the face, a cut on her upper lip, and watery eyes. Id. Furthermore, Gonzales said Appellant ransacked the house, but Officer Portillo saw no evidence of ransacking. Id.
While the discrepancies raised by Appellant's version of events could have been waved away by the jury as self-serving, Gonzales's version of events could not have been waved away absent the cross-examination, which would have revealed her testimony was also self-serving in its own way. Both versions of events being self-serving and suspect, Officer Portillo, who had no apparent bias or interest in the *784 case, would have pushed Gonzales's testimony even further down, and the jury potentially could have found Appellant more credible than Gonzales.
Most importantly to the court of appeals, Appellant's inability to cross-examine Gonzales for bias or interest greatly affected the last Van Arsdall factor, the strength of the State's case. Id. at 34-35. The State's case depended heavily upon Gonzales's testimony, and therefore her credibility was paramount to the strength of the State's case.
The court of appeals's analysis under Van Arsdall was correct, and we should endorse it rather than reverse it. As the Court finds in its opinion: "most of the Van Arsdall factors appear to militate in favor of the court of appeals' conclusion that the error was not harmless beyond a reasonable doubt." Majority op. at 770. Nevertheless, the Court sets aside those militating factors and concludes that Appellant was not harmed in this case because Appellant eventually testified during the defense case, and in his testimony Appellant admitted to striking Jimenez, albeit under a claim of self-defense. Perhaps the argument is that the last Van Arsdall factor, the strength of the prosecution's case, was enough to overcome any impeachment of Gonzales because Appellant testified.
The problem with this is that Appellant's testimony was not a part of the State's case at all. He testified in his own defense and that was after Gonzales testified that Appellant struck Jimenez. Because the trial court did not allow the sought-after cross-examination of Gonzales, which would have decimated Gonzales's credibility, the court basically assured a guilty verdict unless Appellant took the stand to explain and negate what Gonzales said.
IV - Fullest Realization of the Damaging Potential
Returning to the initial assumption we must make under Van Arsdall , fully realizing the damage that Appellant's sought-after cross-examination of Gonzales could have done would have drastically altered the course of the case. Had Gonzales's bias been exposed to the jury, her credibility would have been undermined such that the jury may not have believed her testimony that Appellant struck Jimenez.
It would be reasonable to conclude, then, that had Appellant been able to perform the desired impeachment of Gonzales during the State's case, Appellant almost certainly would not have testified at all during the defense case. Gonzales was the State's only eyewitness to the event. Assuming counsel provided effective assistance, he would have strongly advised Appellant not to testify given the damaged state of the prosecution's case which, at that phase of the trial, hinged entirely upon Gonzales and her believability. With Gonzales's testimony being non-credible, the State would not have been able to show, beyond a reasonable doubt, that Appellant struck Jimenez, and there would have been no need for Appellant to testify to explain why he struck Jimenez.
Furthermore, only because Appellant testified, his prior felony convictions were revealed to the jury. The jurors would not have learned this prejudicial information had Appellant not taken the stand to testify, and experience teaches us that jurors, upon learning of those prior bad acts, regardless of how irrelevant they may be to the offense at trial, internalize those prior bad acts and may improperly make decisions based upon them. There is a "risk that a jury will convict for crimes other than those charged-or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment."
*785 Old Chief v. United States , 519 U.S. 172, 181, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (quoting United States v. Moccia , 681 F.2d 61, 63 (1st Cir. 1982) ). As explained by Professors Goode and Wellborn:
The paradox is that a person's conduct on one occasion would be thought by most persons to be presumptively probative on the issue of her disputed behavior on another. There are few people who do not act on the basis of that belief in their private lives. Most would hesitate to leave their children with a babysitter believed to have been cruel and physically aggressive toward a child. Few would, without special assurances, entrust their church's funds to a person reputed to have been previously dishonest with respect to monies entrusted to her care. These are, of course, examples of using character to predict future conduct rather than, as in court, to recreate past events. However, the probative quality of the character evidence is no less in the latter situation. Nevertheless, the principle of Rule 404(a) points towards exclusion because such evidence "usually is laden with the dangerous baggage of prejudice, distraction, time consumption and surprise."
1 STEVEN GOODE & OLIN GUY WELLBORN III, TEXAS PRACTICE SERIES , GUIDE TO THE TEXAS RULES OF EVIDENCE § 404.2 (4th ed. 2016).
This is the very reason Rule 404 of the Rules of Evidence exists, "to counter the possibility that evidence may be admitted to show a defendant's corrupt nature from which the jury may then render a verdict not on the facts of the case before them, but, rather, on their perception of the defendant's character." Rankin v. State , 974 S.W.2d 707, 709 (Tex. Crim. App. 1996), withdrawn in part on reconsideration , 974 S.W.2d 707, 717 (Tex. Crim. App. 1998) (op. on reh'g). Rule 404(b) allows such evidence only "if it has relevance apart from its tendency 'to prove the character of a person in order to show that he acted in conformity therewith.' " Montgomery v. State , 810 S.W.2d 372, 387 (Tex. Crim. App. 1990) (op. on reh'g) (quoting Tex. R. Crim. Evid. 404(b) ).
Counsel and Appellant were acutely aware that the prejudicial prior felony convictions were going to be admitted into evidence were he to testify-the trial court and counsel thoroughly discussed the State's intention to introduce those acts as impeachment evidence prior to the start of the defense case and Appellant's testimony. Yet counsel and Appellant necessarily had to "take the hit on the chin," because Appellant was unable to thoroughly cross-examine Gonzales and her testimony that Appellant struck Jimenez was left to the jury, untarnished and not subject to question.
If the damage was fully realized, I strongly believe that Appellant would not have testified at all. The jury would have been left with the testimony of the discredited Gonzales, and the jury would never have heard about Appellant's prior felony convictions.
V - Reasonable Doubt
In conclusion, the error-excluding cross-examination of Gonzales over whether she was aware of ongoing child custody proceedings and her interest therein-was not harmless. I am not convinced that the error did not contribute to Appellant's guilty verdict, and I therefore cannot say that the error was harmless beyond a reasonable doubt. It is reasonably doubtful that the jury would have believed Gonzales's testimony if her bias was exposed, and it is reasonably doubtful that Appellant would have testified, admitted to striking Jimenez, and had his prior felony convictions revealed to the jury. Harm resulted as a consequence of limiting Appellant's *786 cross-examination. The court of appeals reached the correct conclusion, and we should affirm it. Because the Court does otherwise, I must dissent.

Portillo testified:
Q. [BY DEFENSE COUNSEL] When you went through the house, did you see anything that was overly disturbed? Was there lamps on the floor, tables turned over, anything that had -- would give you a direct knowledge that something had happened inside the house?
A. No.
Q. You never saw any of that, right?
A. No, I didn't see anything like that.
Q. When you went through the rooms, you never saw anything that was just thrown askew all over the place that would say, Oh, they were stealing something, taking something, doing something within the house, correct?
A. Correct.

In its totality, the pretrial exchange was as follows:
[DEFENSE COUNSEL]: The third and last point, Judge, it is my understanding that CPS is involved and the welfare of the children in whether or not parental rights were taken from the complaining witness, [Jimenez], and the defendant, and that one of the persons who may be -- I don't know how to put this gently -- would get the grandchild would be the mother. Again, it would go to motive as to why -- if she sat up there and saw, based on the police report, if she saw mutual conduct -
THE COURT: So you want to ask Adeline Gonzales whether there's a CPS investigation and whether she gets the children if that CPS issue was sustained?
[DEFENSE COUNSEL]: Yes.
[PROSECUTOR]: I mean, presently she doesn't even have the child. The child is with the aunt. So if she had something to benefit from this, I would think that by now, almost a year later, she would have. The child has been placed with an aunt and it's speculative at this point that pending the result of this trial, even if it would be conferred to Ms. Gonzales.
THE COURT: I'm going to find the CPS investigation and any potential outcomes are not relevant to this trial and in fact would be more prejudice to the defendant.
[DEFENSE COUNSEL]: All right. Please note our objection.

The rule permits extrinsic proof of the circumstances giving rise to the potential bias only after "the witness is first examined about the bias ... and fails to unequivocally admit it." Tex. R. Evid. 613(b)(4).

The logic of the inference is not dependent on Gonzales being a party to the termination proceedings. Because of her concern for the child's safety, it could be inferred that she had an interest in the outcome of those proceedings-and thus, a motive to prevaricate at Appellant's trial-regardless of whether it might have impacted her directly. By the same token, it would have done Appellant little good to develop evidence of Gonzales's concern for the child's safety in the abstract. The reason those facts are important to Appellant's offer of proof was precisely to demonstrate Gonzales's interest in the outcome of the termination proceedings.

See Van Arsdall , 475 U.S. at 684, 106 S.Ct. 1431 ("The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.")

It might be argued that, had Appellant been allowed to fully cross-examine Gonzales, he may well have chosen not to testify, hoping that the jury would simply disbelieve Gonzales's testimony that any assault actually occurred. The record tends to belie this scenario. During his opening statement to the jury at the beginning of trial, Appellant's trial counsel assured the jury that it would hear testimony to contradict the State's account of the assault. Such testimony could only have come from Appellant himself-as, in fact, it later did. It is true that, by the time of this opening argument, the trial court had already made a preliminary ruling that Appellant could not raise the subject of the CPS proceedings during Gonzales's cross-examination. But the trial court had not yet heard Appellant's offer of proof. One of the purposes of an offer of proof is to try to change the trial court's mind, see Goode, Wellborn & Sharlot, 1 Texas Practice: Guide to the Rules of Evidence , § 103.3, at 29 (3d ed. 2002) ("A secondary purpose (of an offer of proof) is to permit the trial judge to reconsider its ruling in light of the actual evidence."), and it is always possible that the trial court would change its ruling upon hearing the offer of proof. Had Appellant not planned to testify from the outset, he would surely have waited to make his promise to the jury in an opening statement made only after the State had concluded its case-in-chief, instead of at the beginning of trial. This circumstance strongly suggests that Appellant's decision to testify was not contingent on the trial court's ruling with respect to the permissible scope of his cross-examination of Gonzales.

The State told the jury in opening arguments that Jimenez was an uncooperative witness.

Alice is a pseudonym because she was a minor at the time of the offense. Tex. R. App. P. 9.10(a)(3).

The State alleged that Jones had previously been convicted of felon in possession of a firearm in October 2009 and for second-degree felony possession of a controlled substance in 2013. After he was convicted, Jones pled true to the enhancement paragraphs.

During voir dire, defense counsel stated that, "[i]f it's mutual combat and the other person starts it, doesn't have to be an assault .... That's not just technically self[-]defense, which it is, but it means something. As a male or female, you don't have to stand to be hit." During his opening remarks, counsel said that "[Jimenez] kicked [the phone] out of [Jones's] hands. And when she did that, there may have been a reaction to it as to a hit on the face." At the charge conference, defense counsel explained the instruction thusly, "if two people are involved in mutual combat, then it's not an assault;"; "It's basically saying that if two people intentionally and knowingly engage in mutual combat, then neither side can say assault ...."

A threshold argument made by the State is that the lower court erred when it considered record evidence other than the offer of proof. I do not address that issue, however, because even if the appellate court improperly relied on the entire record, Jones nonetheless has failed to show a logical connection between the excluded evidence and Gonzales's alleged bias against Jones.

The majority's language is incredibly broad. The only limitation is that the State's witness knows that CPS is trying to terminate the defendant's parental rights. Although I do not agree with the outcome, it ought to at least limit its far-reaching holding only to family violence cases in which the State's witness is a family member of the victim, and there is evidence that the State's witness thinks that the defendant's parental rights should be terminated.

Reyna v. State , 168 S.W.3d 173, 176 (Tex. Crim. App. 2005).

See Mays v. State , 285 S.W.3d 884, 890 (Tex. Crim. App. 2009).

Jones v. State , 540 S.W.3d 16, 25 (Tex. App.-Houston [1st Dist.] August 1, 2017).

Carroll v. State , 916 S.W.2d 494, 497 (Tex. Crim. App. 1996).

Id.

Id.

Id.

Spain v. State , 585 S.W.2d 705, 710 (Tex. Crim. App. 1979) (panel op.).

Carpenter v. State , 979 S.W.2d 633, 634 (Tex. Crim. App. 1998).

Irby v. State , 327 S.W.3d 138, 140 (Tex. Crim. App. 2010).

Id. at 149.

Maj. op. at 769.

Carpenter , 979 S.W.2d at 635.

See , e.g. , Woods v. State , 152 S.W.3d 105, 111-12 (Tex. Crim. App. 2004) (upholding trial court's refusal to allow defense to question witness about possibility of receiving parole or good time because the witness was not eligible for good time and no indication existed that the witness expected to be rewarded); Irby , 327 S.W.3d at 140 (holding that the defendant did not have a constitutional right to question a witness about his status as a juvenile probationer); Adams v. State , 577 S.W.2d 717, 720-21 (Tex. Crim. App. 1979), rev'd on other grounds , 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) (upholding trial court's refusal to allow defense to question a witness about his pending charges); Ex parte Kimes , 872 S.W.2d 700, 703 (Tex. Crim. App. 1993) (holding that when the witness was unaware he was a suspect in two crimes, evidence that he was a "suspect" had "no legitimate tendency to show that [he] was biased in favor of the State").

Cf. Willingham v. State , 897 S.W.2d 351, 358 (Tex. Crim. App. 1995) (defendant failed to show any "specific connection" between witness's alleged hope for early release from prison and his motive to testify).

All of which occurred after the charged offense and are irrelevant to the actual matter of whether Appellant assaulted Jimenez.