Opinion issued August 6, 2019



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-15-00717-CR

———————————

**DEDRIC D'SHAWN JONES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 248th District Court**
**Harris County, Texas**
**Trial Court Case No. 1452040**

---

## MEMORANDUM OPINION ON REMAND

A jury convicted appellant, Dedric D'Shawn Jones, of the third-degree felony

offense of assault on a family member, second offense.[1] After appellant pleaded true

---

[1]     *See* TEX. PENAL CODE ANN. § 22.01(b)(2)(A) (providing that, typically, assault is
         Class A misdemeanor, but offense is third-degree felony if committed against

to the allegations in two enhancement paragraphs, the trial court assessed his punishment at twenty-five years' confinement. On original submission of this appeal, appellant contended that the trial court erred by (1) limiting his cross-examination of a State witness—the complainant's mother—concerning her potential interest in a pending child custody action involving appellant and the complainant, and (2) by excluding evidence that the complainant had threatened and been violent towards her mother in the past because the State opened the door to this evidence during the mother's testimony. A majority of the panel held that the trial court committed reversible error when it limited appellant's cross-examination of the complainant's mother concerning her interest in the child custody proceeding. *See Jones v. State*, 540 S.W.3d 16, 33–35 (Tex. App.—Houston [1st Dist.] 2017), *rev'd*, 571 S.W.3d 764 (Tex. Crim. App. 2019). Because it reversed the judgment of conviction and remanded the case to the trial court, the panel majority did not address appellant's second issue.

The Court of Criminal Appeals subsequently held that, although the trial court's limitation of appellant's cross-examination of the complainant's mother violated his Sixth Amendment right to cross examine witnesses, the error was harmless beyond a reasonable doubt. *See* 571 S.W.3d at 770–72. The Court of

person with whom defendant has dating relationship and defendant has previously been convicted of assault on person with whom defendant has dating relationship).

2

Criminal Appeals reversed our judgment and remanded the case to this Court to address appellant's second issue.

We affirm.

## Background

This case involves a domestic dispute between appellant and his girlfriend, Amy Jimenez. Jimenez did not testify at trial. The only eyewitnesses to the incident between appellant and Jimenez were appellant and Adeline Gonzales, Jimenez's mother.

### A. *Factual Background*

Appellant, Jimenez, their one-year-old daughter A.J. ("Alice"), and Gonzales all lived in a house together in Houston. On the evening of December 17, 2014, all four of them gathered in the living room to watch a movie. During a scene in the movie, appellant made inappropriate comments, and Jimenez told him to stop because her mother was in the room. Tensions between appellant and Jimenez began to rise, and Gonzales left the room with Alice. She later returned to the living room to tell Jimenez that Alice needed some items from the store for school.

Appellant testified that after the rebuke from Jimenez he walked out of the room and went to the garage, where he stayed for around an hour and half while playing games on his cell phone. Jimenez came into the garage "a few times" and talked to appellant. Appellant characterized these conversations as Jimenez "trying

to pick a fight" with him. Appellant was sitting in a "tight little space" between two cars in the garage, focusing on his cell phone and trying to ignore Jimenez. He testified that Jimenez then got in his face and "karate kick[ed the] phone out of my hand." He stated that Jimenez hit his hand "pretty hard," and his phone fell to the floor. He slapped Jimenez in response. He stated that Gonzales was "probably" there in the garage when this occurred, but he doubted that she was able to see what had happened between Jimenez and him.

Appellant stated that Gonzales started yelling at him to leave, which he eventually agreed to do, but he wanted to hug Alice before he left. He testified that Gonzales is "real possessive" of Alice, and she would not let appellant hug Alice before leaving. Appellant went back inside the house to grab his wallet, and he discovered that Gonzales was calling the police. Appellant left the house through the back door, jumped over the fence, and walked to a nearby park. He later came back to the house and was arrested. Appellant agreed with his counsel that Jimenez and Gonzales had "a volatile relationship."

Gonzales testified that, after she told Jimenez that Alice needed some items for school, Jimenez agreed to go to the store and went into the garage, where she started speaking with appellant. Gonzales heard the conversation between Jimenez and appellant start to get heated. Gonzales picked up Alice and opened the door to the garage because she planned to give money to Jimenez for the items Alice needed.

4

Gonzales saw Jimenez try to get appellant's attention by "whack[ing]" or "slapp[ing]" the cell phone in his hand. She did not see Jimenez kick appellant. Appellant then "took a swing at [Jimenez] and he hit her in the face." She stated that appellant hit Jimenez "pretty hard because her whole face went back," and she saw blood coming from Jimenez's lip.

Gonzales told Jimenez to leave and go to her father's house. Gonzales called 9-1-1, and appellant tried to grab Gonzales's phone from her hand. At one point, appellant went inside the house, and when he came back to the garage, he was "[s]creaming obscenities, calling [Gonzales] everything in the book and ransacking what he could." She testified that appellant picked up a jack in the garage and started swinging it around, "walking around like he's tormenting [Gonzales]." While Gonzales was still holding Alice in her arms, appellant yelled and kicked the doors to Gonzales's car, and Gonzales stated that she was afraid for both her safety and Alice's. She testified that appellant grabbed Alice away from her and walked around swinging her while Alice cried and screamed. According to Gonzales, appellant went back inside the house and was screaming and kicking things inside when the police arrived at the house. She stated that, when the officers went inside the house, they did not find anyone, but they saw that the back door was open.

Gonzales testified that Jimenez arrived back at the house after the police had arrived, and Jimenez was angry that Gonzales had called the police. When Jimenez returned, Gonzales could see "a big ball in her lip" and dried blood on her face.

Houston Police Department Officer J. Portillo was the first officer to arrive at the house after Gonzales called 9-1-1. He encountered Gonzales and Jimenez, both of whom "seemed pretty upset and emotional at the time." Officer Portillo testified that Jimenez's face was red and she had watery eyes, and she was not initially cooperative with the officers. He also observed a cut on Jimenez's upper lip. Portillo did not see any damage to property in the garage, and when he went inside the house, he did not get the impression that items in the house had been disturbed or thrown around.

The trial court admitted copies of several letters that appellant wrote to Jimenez while he was in custody during the pendency of this case. In the letters, appellant attempted to persuade Jimenez to sign an affidavit of non-prosecution and to tell the district attorney that she had lied to the police about the incident. In one letter, appellant stated, "Man, Amy, I already know you wouldn't testify against me so why wouldn't you lie for me." In another letter, appellant stated,

> And I need you to tell them [the district attorney and the trial court] that didn't happen at all, Amy. Tell them that you thought I got caught cheating and you was just mad at the time, Amy, and you lied to the police about what happened and you just wanted me to go to jail, Amy. . . . Straight tell them people that you don't wanna testify against me and that you ain't coming to court. But I'ma need you to have your

6

mom do the same thing, Amy. Straight up because she was a witness. Ain't nobody else on my report except you and your mom, Amy.

Gonzales testified that she found these letters at the house after she told appellant to stop contacting Jimenez and that she delivered the letters to the prosecutor.

### B.    *Procedural Background*

Before testimony began, defense counsel stated that he wanted to question Gonzales about Jimenez's reputation in the community for being violent, including whether there was a history of violence between Jimenez and Gonzales. Defense counsel stated, "I believe it goes to the motive as to why the mother [Gonzales] is the person who is—who calls in and becomes a main witness for the State, not [Jimenez]." The trial court stated:

> So my ruling is that—my understanding is that the witness, Adeline Gonzales, is an eyewitness to this offense. So *Crawford* [*v. Washington*] really is not applicable because the defense is going to have the opportunity to cross-examine Adeline Gonzales.

> Second, it is not admissible—my ruling is that any proof of facts of criminal conduct that Adeline Gonzales might know about or any previous types of violence that Adeline Gonzales may know about or any fights between Adeline Gonzales and the complainant [Jimenez] are not relevant to this case and are not admissible under 601.

> Further, under 608, the reputation for violence is not admissible. So those questions will not be permitted. If you feel that specific acts of conduct by Amy Jimenez become relevant through Adeline Gonzales, of course, acts of criminal violence that go to the facts of this offense, but if you believe that any previous acts of conduct, any other specific instances become relevant, just ask to approach and discuss it. At this point I don't see how they are, so those are not admissible.

7

During the direct examination of Gonzales, the State asked her to tell the jury about Jimenez. Gonzales stated that Jimenez is an only child and "has always been a very vibrant person." She testified: "Always been a good kid. She's been in parochial school her whole life since she was four years old. And then, of course, she went into high school, decided to go to public school. Always been a good kid. She never was in trouble."

The following exchange occurred during cross-examination of Gonzales:

| | |
|---|---|
| Defense counsel: | At this time I renew my request to go into— |
| The Court: | Right. What's your objection? |
| The State: | It's not relevant and it would be based on hearsay. |
| The Court: | It's outside 609. I don't think it's permitted by the Rule. |
| Defense counsel: | I think the door's been opened, 701 and 601, just on two points. What type of daughter was she [Jimenez]? She was a good girl to their relationship. I think that opens the door to me being able to ask questions. If my request is overruled—I mean, sustained, if the State's objection is sustained, I would ask for the right to make a bill of exception what I would be asking at this time. |
| The Court: | We can do that at the lunch hour. So the objection is sustained and we'll do that at the lunch hour. |

The trial court did not allow defense counsel to cross-examine Gonzales in front of the jury concerning any past violent behavior that Jimenez had engaged in with respect to Gonzales.

8

Defense counsel made the following bill of exception outside the presence of the jury:

| | |
|---|---|
| Defense counsel: | Let the record reflect I'm asking these questions under 701 and 405. You stated in direct testimony that Amy was a good kid and never got in trouble, correct? |
| Gonzales: | That's correct. |

. . . .

| | |
|---|---|
| Defense counsel: | You've known Amy for all her life? |
| Gonzales: | Correct. Yes. |
| Defense counsel: | And you know her—do you know her reputation for violence in the community? |
| Gonzales: | Violence in the community? |
| Defense counsel: | Has she made threats to other people? |
| Gonzales: | If she has—I'm sorry? |
| Defense counsel: | That you're personally aware of? |
| Gonzales: | No. |

. . . .

| | |
|---|---|
| Defense counsel: | And what about your relationship regarding Amy? Has she ever threatened you? |
| Gonzales: | Yes. |
| Defense counsel: | And is that on few or many occasions? |
| Gonzales: | Few occasions. |

. . . .

| | |
|---|---|
| Defense counsel: | Has Amy ever hit you? |
| Gonzales: | Yes. |
| Defense counsel: | Did she hit you before you hit her? |

9

Gonzales:          Yes.

Defense counsel:   And that's on several occasions; isn't that true?

Gonzales:          Yes.

After defense counsel made the bill of exception, when the parties were discussing the admissibility of expert testimony from a social worker with the Harris County District Attorney's Office, counsel asked the trial court, "Will I be able to get into the violent aspect that Amy may have for whatever reason?" Counsel stated, "[T]he Court has heard, you know, that [Jimenez] strikes first on many occasions." The trial court stated that its ruling remained the same and that evidence concerning Jimenez's violent conduct towards Gonzales was not relevant.

The jury charge included an instruction on the law of self-defense. The jury rejected that defense and found appellant guilty of the offense of assault on a family member, second offense. After appellant pleaded true to the allegations in two enhancement paragraphs, the trial court assessed his punishment at twenty-five years' confinement. This appeal followed.

**Exclusion of Evidence**

In his second issue, appellant contends that the trial court erred by excluding rebuttal evidence that Jimenez, the complainant, had engaged in violent acts and other threatening behavior towards Gonzales, her mother, in the past. Specifically, appellant argues that the State opened the door to this evidence when it elicited

10

testimony from Gonzales that Jimenez had "always been a good kid" and "was never in trouble," allowing appellant to introduce rebuttal evidence to correct the false impression of Jimenez's character left by Gonzales's testimony.

## A.  *Standard of Review and Governing Law*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement, that is, when the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* at 83 (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)). We uphold a trial court's evidentiary ruling if it was correct on any legal theory or basis applicable to the case. *Id.* at 93; *Jones v. State*, 466 S.W.3d 252, 261 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

Generally, evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in conformity with the character or trait. TEX. R. EVID. 404(a)(1). However, in a criminal case, a defendant may offer evidence of a victim's pertinent character trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it. TEX. R. EVID. 404(a)(3)(A). Furthermore, although evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person

11

acted in accordance with the character, this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. TEX. R. EVID. 404(b)(1)–(2).

The Court of Criminal Appeals has noted that, under Rule 404, evidence of a complainant's character for violence is admissible for non-character-conformity purposes, such as to show that the complainant was the first aggressor, the defendant's state of mind, or the reasonableness of the defendant's fear of danger. *See Torres v. State*, 71 S.W.3d 758, 760–62 (Tex. Crim. App. 2002); *Mozon v. State*, 991 S.W.2d 841, 845–46 (Tex. Crim. App. 1999); *London v. State*, 325 S.W.3d 197, 205 (Tex. App.—Dallas 2008, pet. ref'd). However, a complainant's unambiguous violent or aggressive act needs no explaining, and evidence of a complainant's extraneous violent conduct admitted in conjunction with her unambiguous violent act has no relevance apart from its tendency to prove the complainant's character conformity and is therefore inadmissible. *Mai v. State*, 189 S.W.3d 316, 321 (Tex. App.—Fort Worth 2006, pet. ref'd); *see London*, 325 S.W.3d at 205; *Reyna v. State*, 99 S.W.3d 344, 347 (Tex. App.—Fort Worth 2003, pet. ref'd). Therefore, before an extraneous act of the complainant will be admissible to support a claim of self-defense, two conditions must exist: (1) there must be some ambiguous or uncertain evidence of a violent or aggressive act by the complainant that tends to show the complainant was the first aggressor; and (2) the proffered evidence must tend to

dispel the ambiguity or explain the complainant's conduct. *Mai*, 189 S.W.3d at 321; *Reyna*, 99 S.W.3d at 347; *see Torres*, 71 S.W.3d at 762 (stating that, for purpose of proving complainant was first aggressor, proffered evidence must explain complainant's conduct).

Evidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009). A party opens the door by leaving a false impression with the jury that invites the other party to respond. *Hayden*, 296 S.W.3d at 554. If a witness's "blanket assertion of exemplary conduct" is "directly relevant to the offense charged," the opposing party may cross-examine the witness and offer extrinsic evidence rebutting the witness's statement. *Winegarner v. State*, 235 S.W.3d 787, 790–91 (Tex. Crim. App. 2007); *see Daggett v. State*, 187 S.W.3d 444, 453 n.24 (Tex. Crim. App. 2005) ("When a witness makes a broad statement of good conduct or character on a collateral issue, the opposing party may cross-examine the witness with specific instances rebutting that false impression, but generally may not offer extrinsic evidence to prove the impeachment acts."); *Delk v. State*, 855 S.W.2d 700, 704 (Tex. Crim. App. 1993) ("Where the witness creates a false impression of law abiding behavior, he 'opens the door' on his otherwise irrelevant past criminal history and opposing counsel may expose the falsehood.").

Even if a party opens the door to rebuttal evidence, the trial court still has discretion to exclude the evidence under Rule 403. *Hayden*, 296 S.W.3d at 554; *see* TEX. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."). Courts generally do not permit a party to use extrinsic evidence to impeach a witness on a collateral issue. *Hayden*, 296 S.W.3d at 554. An issue is considered collateral if, beyond its impeachment value, a party "would not 'be entitled to prove it as part of his case tending to establish his plea.'" *Id.* (quoting *Bates v. State*, 587 S.W.2d 121, 142 (Tex. Crim. App. 1979) (op. on reh'g)). "Unless the witness's testimony created a false impression that is 'directly relevant to the offense charged,' allowing a party to delve into the issue beyond the limits of cross examination wastes time and confuses the issues." *Id.* (quoting *Daggett*, 187 S.W.3d at 453 n.24).

Error in the exclusion of evidence is non-constitutional error subject to a harm analysis under Rule of Appellate Procedure 44.2(b). *Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005); *see* TEX. R. APP. P. 44.2(b) (providing that we must disregard non-constitutional errors that do not affect defendant's substantial rights). Under this analysis, we must examine the record as a whole, and if we are fairly assured that the error did not influence the jury or had but a slight effect, we conclude

14

that the error was harmless. *Ray*, 178 S.W.3d at 836; *see Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007) (stating that under Rule 44.2(b), we may not reverse conviction for non-constitutional error if, after examining entire record, we have "fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict"). In making this determination, we consider the entire record, including any testimony or physical evidence, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury charge, the State's theory and defensive theory of the case, closing arguments, voir dire, if applicable, and whether the State emphasized the error. *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002).

## B.    *Analysis*

Assuming, without deciding, that Gonzales's testimony on direct examination that Jimenez had "always been a good kid" and "never was in trouble" opened the door to allowing evidence concerning Jimenez's prior threatening and violent conduct directed toward Gonzales and that the trial court erred by excluding this evidence, we conclude that exclusion of this evidence did not harm appellant.

After this Court issued its opinion in this case addressing appellant's first issue, the Court of Criminal Appeals granted discretionary review, held that the trial court erred by limiting appellant's cross-examination of Gonzales concerning her

15

potential bias against appellant arising out of her interest in a child custody proceeding involving appellant, Jimenez, and Alice, and conducted a harm analysis. *See Jones*, 571 S.W.3d at 770–72. In that analysis, the court addressed the evidence of the assault on Jimenez and stated:

> Appellant testified and admitted that he struck Jimenez. The only material difference between Appellant's account and Gonzales's was their respective descriptions of Jimenez's initial assault upon Appellant which gave rise to Appellant's claim of self-defense. Gonzales claimed Jimenez "whacked" or "slapped" the cell phone that was in Appellant's hand. Her testimony varied slightly from direct- to cross-examination with respect to whether this caused Appellant to drop the cell phone, but she never said Jimenez struck Appellant's hand. On direct examination, she testified that she did not see whether the cell phone dropped. On cross-examination, however, she agreed that Jimenez's blow did suffice to knock the cell phone out of Appellant's hand. By contrast, Appellant testified that Jimenez "karate-kicked" his hand, causing the cell phone to drop. Gonzales denied that Jimenez ever kicked either Appellant or his cell phone. Appellant testified that he doubted Gonzales could even have seen what happened from her particular vantage in the garage.

> Nothing about this particular dispute could likely have dictated the outcome of the jury's resolution of Appellant's self-defense claim. The jury was instructed that, in order to find that Appellant struck Jimenez in self-defense, it must find that her initial attack upon him "created" in his mind "a reasonable expectation or fear of some bodily injury." *See* TEX. PENAL CODE § 9.31(a) ("[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use of unlawful force."). The jury's resolution of the reasonableness of Appellant's belief (if any) that Jimenez was about to cause him bodily injury would not likely have turned on the subtle difference between Gonzales's account of Jimenez's conduct and his own. Under either account, the jury would likely have concluded that Jimenez struck at Appellant hard enough to knock the phone out of his hand, whether she also struck his hand in the process or not. Moreover,

whether she dealt the blow with her own hand or with a "karate kick" does not seem to be a distinction that would likely sway the jury's assessment of the reasonableness of Appellant's apprehension that unlawful force was "immediately necessary" to protect himself.

*Id.* at 771. The court then stated that any cross-examination to expose Gonzales's potential bias against appellant "would only marginally have increased the damage already inflicted upon her general credibility by other evidence that the jury was permitted to hear." *Id.* at 771–72. The court noted that Gonzales's testimony that, after the assault, appellant ransacked the house was contradicted by Officer Portillo's testimony that he observed nothing indicating the house had been ransacked. *Id.* at 772. The court also noted, "[T]he jury would have perceived a potential for bias on Gonzales's part inherent in the simple fact that she was both the victim's mother and the child's grandmother." *Id.* The court stated that it was confident beyond a reasonable doubt that the jury would have rejected appellant's self-defense claim even if it had been aware that Gonzales potentially had an interest in child custody proceedings involving appellant, Jimenez, and Alice. *Id.*

Although the Court of Criminal Appeals was addressing the harm flowing from a different error of the trial court when it conducted its harm analysis, its analysis is relevant to the question before us now: whether the exclusion of evidence that Jimenez had been violent and had threatened Gonzales in the past harmed appellant. It is undisputed that Jimenez was the first aggressor in this incident. Whether she "whacked" or "slapped" the phone that appellant was holding, or

17

whether she "karate kicked" appellant's hand, causing him to drop the phone, both appellant and Gonzales, the two eyewitnesses to the incident, agreed that Jimenez was the one who introduced a physical component to her argument with appellant. It is also undisputed that appellant then struck Jimenez. Therefore, the question before the jury was whether appellant acted in self-defense when he struck Jimenez, that is, whether appellant was justified in using force against Jimenez because he "reasonably believe[d] the force [was] immediately necessary to protect [him] against [Jimenez's] use or attempted use of unlawful force." *See* TEX. PENAL CODE ANN. § 9.31(a).

Appellant argues that Gonzales, through her testimony that Jimenez had "always been a good kid" who "never got into trouble," portrayed Jimenez as a non-violent person, supporting her version of the assault. He argues that if the jury had heard that Jimenez had threatened and assaulted Gonzales on several prior occasions, "this evidence would have cast doubt on both Gonzales's account of the offense and her credibility as a whole," and the evidence "would have provided the jury with valuable insight into Jimenez's relevant violent character." However, as we have stated, although there was conflicting evidence concerning Jimenez's precise actions toward appellant, the evidence was undisputed that she started the physical altercation. *See Jones*, 571 S.W.3d at 771 (stating that only material difference between appellant's and Gonzales's versions of incident "was their respective

18

descriptions of Jimenez's *initial assault* upon Appellant which gave rise to Appellant's claim of self-defense" and that jury was instructed that, to find that appellant struck Jimenez in self-defense, it had to find that her "*initial attack*" on appellant created in his mind "a reasonable expectation or fear of some bodily injury") (emphasis added). The jury therefore had evidence before it concerning Jimenez's violent character, as both eyewitnesses testified that she took physical action against appellant before appellant took physical action against her.

Additionally, Gonzales testified in the bill of exception that Jimenez had threatened her on a "few" occasions and that Jimenez had hit her on "many" occasions. Gonzales did not provide specific information concerning when these occasions occurred, nor is there any indication in the record that appellant was aware of Jimenez's past violent and threatening behavior toward Gonzales, such that evidence of Jimenez's past behavior—and appellant's knowledge of that past violent behavior—created a reasonable belief on appellant's part that his use of force against Jimenez was immediately necessary to protect himself against Jimenez's use of force. *See* TEX. PENAL CODE ANN. § 9.31(a) (setting out defense of self-defense).

Furthermore, to the extent appellant argues that evidence of Jimenez's past violent conduct towards Gonzales undermines Gonzales's credibility by demonstrating that Gonzales has a low standard for what she considers to be good character, we note, as the Court of Criminal Appeals did, that other evidence in the

19

record, most notably Officer Portillo's testimony contradicting Gonzales's claims that appellant ransacked the house after assaulting Jimenez and the potential for bias against appellant inherent in Gonzales's status as Jimenez's mother and Alice's grandmother, already negatively impacted her credibility. *See Jones*, 571 S.W.3d at 771–72. Evidence that Jimenez had threatened and been violent towards Gonzales in the past "would only marginally have increased the damage already inflicted upon [Gonzales's] general credibility by other evidence that the jury was permitted to hear." *See id.*

Finally, the record also included several letters that appellant sent to Jimenez while he was in custody pending trial. Each of these letters included an affidavit of non-prosecution—requesting that the district attorney cease prosecution of the case against appellant—that appellant drafted and attempted to persuade Jimenez to sign. In the letters, appellant repeatedly asked Jimenez to speak to the district attorney and the trial court and state that the assault did not happen, that Jimenez had discovered that appellant was being unfaithful to her and that she fabricated the assault because she was angry with him, and that she lied to the police about the incident. Appellant stated, "I already know you wouldn't testify against me so why wouldn't you lie for me."

When considering the entire record, we conclude that any error in the exclusion of evidence that Jimenez had threatened and been violent towards

20

Gonzales in the past did not influence the jury or had but slight effect and therefore was harmless.[2] *See Casey*, 215 S.W.3d at 885; *Ray*, 178 S.W.3d at 836; *see also* TEX. R. APP. P. 44.2(b) (providing that we disregard non-constitutional errors that do not affect defendant's substantial rights).

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Kelly, and Goodman.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[2] Appellant also argues that the trial court erred in excluding evidence that someone had let the air out of the tires on Gonzales's car on the day of trial, which delayed the start of testimony. In the bill of exception, Gonzales testified that this happened to other people in the area as well, not only to her. She also stated that Jimenez knew the date Gonzales was supposed to testify in appellant's trial, but she did not believe Jimenez was the one who let the air out of her tires, and she did not believe Jimenez had a motive to do this. There is, therefore, no evidence that Jimenez was the one who disabled Gonzales's car on the day of trial by letting the air out of the tires. Instead, there is only defense counsel's speculation that Jimenez was responsible. The trial court did not err by excluding this speculative and irrelevant evidence. *See* TEX. R. EVID. 401 (providing that evidence is relevant if it has any tendency to make fact of consequence more or less probable than it would be without evidence).

21